# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF MISSISSIPPI
### DELTA DIVISION


**WILLIAM LEE WILEY**                                              **PETITIONER**

**vs.**                                              **CIVIL ACTION NO.: 2:00CV130-P-A**

**CHRISTOPHER EPPS, ET AL.**                                              **RESPONDENTS**


## MEMORANDUM OPINION

Petitioner William Lee Wiley filed the instant petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254, seeking to challenge his otherwise final death sentence for capital murder.

## Procedural and Factual History

Shortly after closing his convenience store around midnight on August 22, 1981, J.B. Turner and his daughter, Patricia Harvey, were shot outside of Mr. Turner's store with a sawed-off, .20-gauge shotgun. Mr. Turner suffered a gunshot wound to his back and a fatal wound to his chest, and he died at the scene. Mrs. Harvey survived but was blinded as a result of the shooting. A black receipt box, in which Mr. Turner had placed the night's receipts and a leather money bag containing between $350 and $400, was taken. An investigation of the scene disclosed three spent .20-gauge shotgun shells and one live round. A green army fatigue cap and black box were found near the scene of the crime. Several days later, a .20-gauge sawed-off pump shotgun was found in the weeds behind Mr. Turner's store, and a subsequent trace revealed that William Lee Wiley, Petitioner, was the owner of the gun. Approximately two and one-half weeks later, Petitioner was arrested in Memphis, Tennessee, and he subsequently confessed to the murder and robbery. Petitioner led police to where he discarded the empty

money bag and to an automobile where he had kept the shotgun hidden prior to the commission of the crime.

On February 18, 1982, a jury in the Circuit Court of DeSoto County, Mississippi, convicted Petitioner of capital murder and sentenced him to death.[1]  On appeal, the Mississippi Supreme Court affirmed the jury's finding of guilt but remanded the case for resentencing due to the prosecutor's improper references of appellate review of the death sentence.  *Wiley v. State*, 449 So.2d 756 (Miss. 1984).  On June 20, 1984, following a new sentencing hearing, a jury sentenced Petitioner to death for a second time.  The Mississippi Supreme Court affirmed the sentence and denied Petitioner rehearing on March 19, 1986.  *Wiley v. State*, 484 So.2d 339 (Miss. 1986), *cert. denied*, 479 U.S. 906 (1986).  Petitioner's application for post-conviction relief was denied by the Mississippi Supreme Court on November 25, 1987, and rehearing and certiorari were later denied.  *Wiley v. State*, 517 So.2d 1373, *cert. denied*, 487 U.S. 1246 (1988).  Petitioner then filed a petition in this Court seeking federal habeas relief, which was denied by unpublished opinion and order on May 4, 1990.  *Wiley v. Puckett*, No. DC88-132-B-O.  On appeal, the United States Court of Appeals for the Fifth Circuit vacated the portion of the judgment relating to the "especially heinous, atrocious, or cruel" aggravating circumstance and remanded the matter to this Court with instructions to issue the writ unless the State initiated proceedings within a reasonable time.  *Wiley v. Puckett*, 969 F.2d 86, 105-06 (5th Cir. 1992).

Petitioner filed a "Motion and Application for a Life Sentence, or, in the Alternative, for a New Sentencing Hearing" on February 23, 1993, which the Mississippi Supreme Court denied

---

[1] Petitioner was tried separately and found guilty of aggravated assault on Mrs. Harvey and sentenced to a prison term of twenty years.

as to the life sentence but granted as to the new sentencing. *Wiley v. State*, 635 So.2d 802 (Miss. 1993). The court remanded the matter to the DeSoto County Circuit Court, and following a jury trial, Petitioner was sentenced to death for a third time on February 3, 1995. The Mississippi Supreme Court affirmed. *Wiley v. State*, 691 So.2d 959 (Miss. 1997), *reh'g denied*, 693 So.2d 384 (Miss. 1997), *cert. denied*, 522 U.S. 88 (1997) ("*Wiley I*").

On April 17, 1998, Petitioner filed an application for state post-conviction relief, which the court denied on June 3, 1999. *Wiley v. State*, 750 So.2d 1193 (Miss. 1999), *cert. denied*, 530 U.S. 1275 (2000) ("*Wiley II*"). A second post-conviction application was filed on October 17, 2002, which the Mississippi Supreme Court denied on April 17, 2003. *Wiley v. State*, 842 So.2d 1280 (Miss. 2003) ("*Wiley III*"). Petitioner filed a third post-conviction application on June 19, 2003, based on the United States Supreme Court decision in *Atkins v. Virginia*, 536 U.S. 304 (2002). The Mississippi Supreme Court denied relief on August 26, 2004, and rehearing was denied on October 28, 2004. *Wiley v. State*, 890 So.2d 892 (Miss. 2004) ("*Wiley IV*"). No petition for a writ of certiorari to the United States Supreme Court was filed.

Petitioner filed his initial petition for a writ of habeas corpus with this Court on June 29, 2000, and his third and final amended petition was filed on December 14, 2004 (docket entry no. 23). On February 2, 2007, this Court denied Petitioner relief on all fourteen claims of error raised in his petition, but it later withdrew the opinion, order, and judgment when it partially granted Petitioner's motion to alter the judgment based solely upon its resolution of Petitioner's *Atkins* claim. (*See* docket entry no. 38). The Court held an evidentiary hearing on Petitioner's *Atkins* claim on June 17, 2009. Petitioner and Respondents have had the opportunity to file post-hearing briefs on the issue of whether Petitioner suffers from mental retardation, and the Court

is now ready to rule on all of Petitioner's claims of error. Petitioner raises the following claims

of error from his 1995 State court proceedings:

I.      **WILEY WAS DENIED HIS FEDERAL CONSTITUTIONAL RIGHT TO THE EFFECTIVE ASSISTANCE OF COUNSEL ON APPEAL OF HIS SENTENCING TRIAL.**

II.     **WILEY WAS DENIED HIS SIXTH, EIGHTH, AND FOURTEENTH AMENDMENT RIGHTS TO THE EFFECTIVE ASSISTANCE OF COUNSEL AT HIS SENTENCING TRIAL.**

III.    **WILEY WAS DENIED HIS EIGHTH AND FOURTEENTH AMENDMENT RIGHTS WHEN THE MISSISSIPPI COURTS ALLOWED EXTENSIVE DISCUSSION OF PAROLE DURING VOIR DIRE.**

IV.    **WILEY WAS DENIED HIS EIGHTH AND FOURTEENTH AMENDMENT RIGHTS WHEN THE MISSISSIPPI COURTS REFUSED WILEY'S PROPOSED JURY INSTRUCTION ON THE "DIMINISHED CAPACITY" STATUTORY MITIGATING FACTOR.**

V.     **WILEY WAS DENIED HIS EIGHTH AND FOURTEENTH AMENDMENT RIGHTS WHEN THE MISSISSIPPI SUPREME COURT FOUND THAT WILEY'S DEATH SENTENCE WAS PROPORTIONAL TO COMPARABLE CASES.**

VI.    **WILEY'S EIGHTH AND FOURTEENTH AMENDMENT RIGHTS WERE VIOLATED BY THE STATE'S REPEATED REFERENCES TO PAROLE.**

VII.   **WILEY'S EIGHTH AND FOURTEENTH AMENDMENT RIGHTS WERE VIOLATED BY THE TRIAL COURT'S DECISION TO STRIKE ALL REFERENCES TO MERCY AND SYMPATHY FROM THE JURY INSTRUCTION.**

VIII.  **WILEY'S EIGHTH AND FOURTEENTH AMENDMENT RIGHTS WERE VIOLATED BY THE STATE'S IMPROPER "SEND A MESSAGE" ARGUMENT.**

IX.    **WILEY'S EIGHTH AND FOURTEENTH AMENDMENT RIGHTS WERE VIOLATED BY THE IMPOSITION OF A DEATH SENTENCE IN RELIANCE ON THE AVOIDING ARREST AGGRAVATING FACTOR.**

X.     **THE TRIAL COURT'S FAILURE TO DEFINE THE ELEMENTS OF ROBBERY FOR THE JURY VIOLATED THE EIGHTH AND FOURTEENTH AMENDMENTS.**

XI.    **WILEY'S SIXTH, EIGHTH, AND FOURTEENTH AMENDMENT RIGHTS WERE VIOLATED BY TRIAL COUNSEL'S FAILURE TO INVESTIGATE AND PRESENT MITIGATION EVIDENCE CRUCIAL TO THE SENTENCING DETERMINATION.**

XII.   **THE MISSISSIPPI SUPREME COURT'S DENIAL OF INVESTIGATIVE FUNDS TO WILEY VIOLATED HIS EIGHTH AND FOURTEENTH AMENDMENT RIGHTS.**

XIII.  **EXECUTION OF WILEY, WHO IS MENTALLY RETARDED, WOULD VIOLATE THE EIGHTH AND FOURTEENTH AMENDMENTS UNDER**

**ATKINS V. VIRGINIA, 536 U.S. 304 (2002).**

**XIV. THE ACCUMULATION OF ERROR IN THIS CASE VIOLATED WILEY'S SIXTH, EIGHTH AND FOURTEENTH AMENDMENT RIGHTS.**

Petitioner's claims, while individually considered, have been renumbered and consolidated for the sake of convenience.

<u>**Applicable Standard**</u>

Petitioner filed his federal habeas corpus petition after the effective date of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"); therefore, the AEDPA governs this Court's review of his claims. *See Penry v. Johnson*, 532 U.S. 782, 792 (2001). Title 28 U.S.C. § 2254(a) allows a district court to consider a petitioner's application for writ of habeas corpus based on a claim that the petitioner is, as a result of a state court judgment, "in custody in violation of the Constitution or laws or treaties of the United States." The AEDPA prohibits a petitioner's relitigation of issues that were adjudicated on the merits in state proceedings unless that adjudication either "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or ( 2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." *See Williams v. Taylor*, 529 U.S. 362, 404-05 (2000); 28 U.S.C. § 2254(d)(1) and (2). A state court's factual findings carry a presumption of correctness on federal habeas review, and a petitioner wishing to challenge state court fact-finding must rebut the presumption by clear and convincing evidence. *See Foster v. Johnson*, 293 F.3d 766, 776 (5th Cir. 2002); *Miller v. Johnson*, 200 F.3d 274, 281 (5th Cir. 2000), *cert. denied*, 531 U.S. 849 (2000).

The "contrary to" and "unreasonable application" clauses of § 2254(d)(1) have independent meanings. *See Bell v. Cone*, 535 U.S. 685, 694 (2002); *Penry*, 532 U.S. at 792; *Williams*, 529 U.S. at 404-05. A federal court may grant habeas relief under the "contrary to" clause if (1) the state court's conclusion on a question of law is opposite that reached by the Supreme Court, or (2) the state court decides a case differently than the United States Supreme Court has on facts that are materially indistinguishable. *See Mitchell v. Esparaza*, 540 U.S. 12, 15-16 (2003); *Bell*, 535 U.S. at 694; *Penry*, 532 U.S. at 792; *Williams*, 529 U.S. at 404-06. Under the "unreasonable application" clause, a federal court may grant habeas relief if the state court identifies the applicable legal principle from decisions of the Supreme Court but unreasonably applies the principle to the facts at issue. *See Wiggins v. Smith*, 539 U.S. 510, 520 (2003); *Woodford v. Visciotti*, 537 U.S. 19, 25 (2002); *Bell*, 535 U.S. at 694; *Penry*, 532 U.S. at 792; *Williams*, 529 U.S. at 407-08. The "unreasonable application" inquiry requires a federal court to question whether the state court's application of Supreme Court precedent was "objectively unreasonable," which requires more than a showing that the decision was merely incorrect. *See Price v. Vincent*, 538 U.S. 634, 641 (2003) ("[I]t is the habeas applicant's burden to show that the state court applied that case to the facts of his case in an objectively unreasonable manner."); *Woodford*, 537 U.S. at 25; *Penry*, 532 U.S. at 793; *Williams*, 529 U.S. at 409-11; *Bell*, 535 U.S. at 694. Moreover, it is the ultimate decision or conclusion reached by the state court that is reviewed, and not the quality of the opinion. *See Pondexter v. Dretke*, 346 F.3d 142, 148 (5th Cir. 2003) (question before federal habeas court is whether ultimate conclusion of state court was objectively reasonable); *Neal v. Puckett*, 286 F.3d 230, 246 (5th Cir. 2002) (en banc) (holding § 2254(d) authorizes federal court to review state court's decision only

and not explanation of decision).

The AEDPA imposes the burden of obtaining an evidentiary hearing in federal court on the petitioner, and it also limits the circumstances in which an evidentiary hearing may be granted for those petitioners who have failed to diligently seek to establish the factual bases for their claims in state court. *See Williams*, 529 U.S. at 433-34 (prisoners at fault for deficiency in state court record must satisfy heightened standard to obtain evidentiary hearing); *Clark v. Johnson*, 202 F.3d 760, *cert. denied*, 531 U.S. 831 (2000); *McDonald v. Johnson*, 139 F.3d 1056, 1059 (5th Cir. 1998); 28 U.S.C. § 2254(e)(2).

With the foregoing principles in mind, this Court turns to the merits of Petitioner's claims for federal habeas corpus relief.

## I.      Ineffective Assistance of Counsel

A criminal defendant is entitled to the effective assistance of counsel. *See Douglas v. California*, 372 U.S. 353, 357-58 (1963); *Evitts v. Lucey*, 469 U.S. 387 (1985). A claim of ineffective assistance of counsel may only be sustained upon proof that (1) trial counsel's performance was deficient, and (2) trial counsel's deficiency resulted in prejudice to the defendant. *See Strickland v. Washington*, 466 U.S. 668, 687 (1984). Both the "deficiency" and the "prejudice" prongs must each be satisfied, or it cannot be said that the adversarial process was so lacking that it rendered an unreliable result, thereby denying Petitioner a fair trial. *See id.*

To show he was deprived of a fair trial, Petitioner must overcome the presumption that counsel rendered reasonable professional assistance by showing counsel's errors prejudiced his defense to such a degree that there exists a reasonable probability that if those errors were not committed

by counsel, the outcome of trial would have been different. *See id.* at 694 ( holding "reasonable probability is a probability sufficient to undermine confidence in the outcome"); *Lockhart v. McCotter*, 782 F.2d 1275, 1283 (5th Cir. 1986) (deficiency of counsel that results in error that raises reasonable probability results of proceedings would have been different but for the error denies defendant effective assistance of counsel). Moreover, Petitioner must overcome the presumption of effective assistance by demonstrating counsel's actions were not within the province of a reasonable trial strategy. *See id.* at 689.

Ordinarily, failure to raise a claim on appeal bars it from further review. *See* Miss. Code Ann. § 99-39-21(1). Normally, in order to overcome the imposition of a procedural bar considered independent of federal law and adequate to support the judgment, a petitioner must demonstrate cause for the default and resulting prejudice. *See, e.g., Coleman v. Thompson*, 501 U.S. 722, 750 (1991); *Wainwright v. Sykes*, 433 U.S. 72 (1977). The Court notes, however, that a meritorious ineffective assistance of counsel claim can establish cause to overcome the imposition of a procedural bar and allow a review of a defaulted claim. *See Murray v. Carrier*, 477 U.S.478, 488-89 (1986).

A.     Appeal: "Avoiding Arrest" Aggravator

Petitioner asserts he received ineffective assistance of counsel on direct appeal of his resentencing trial when counsel failed to appeal the jury's finding of the "avoiding arrest" statutory aggravating factor. (Pet. Memo 8). Two statutory aggravating factors were found by the jury: (1) that the murder was committed during the course of a robbery[2], and (2) that the

---

[2] "The capital offense was committed while the defendant was engaged in . . . the commission of . . . [a] robbery." Miss. Code Ann. § 99-19-101 (5)(d).

murder was committed for the purpose of avoiding arrest.[3]  Trial counsel objected to the

submission of the factor to the jury on the basis that it was unsupported by the evidence, but

appellate counsel failed to raise a challenge to the jury's finding of the aggravating factor.  (Trial

Tr. vol. 7, 630, January 26, 1995)(No. 95-DP-149).  Petitioner asserts appellate counsel's failure

to raise this argument constituted ineffective assistance of counsel for three reasons.  First, he

argues that no evidence existed the robbery and murder were carried out to avoid arrest.  Second,

he maintains that if the evidence is sufficient to allow the offense to fall within the factor, it is

invalid as constitutionally overbroad.  Third, he contends that it is impermissibly duplicative of

the "during the commission of a robbery" aggravating factor.  (Pet. Memo 9).  Petitioner argues

that if these issues had been raised, the factor would have been reversed by the Mississippi

Supreme Court, leaving one aggravating factor and no record of the mitigating factors found by

the jury, thus raising a "strong likelihood" that the death sentence would have been vacated.  (Pet.

Memo 9-10).

In the instant petition, Petitioner argues as a substantive claim that the "avoiding arrest"

aggravator is invalid as an attempt to demonstrate his counsel's ineffectiveness.  Petitioner

appears to rely upon what he deems the obvious merit of his argument in order to establish cause

for the defaulted substantive claim, which is also raised as a separate claim of error.  As his

ineffective assistance claim argues the merits of the substantive claim, the substantive claim will

be here analyzed to avoid later repetition of Petitioner's arguments on the substantive merits.

1. *Insufficient Evidence to Support the Avoiding Arrest Aggravating Factor*

---

[3] "The capital offense was committed for the purpose of avoiding or preventing a lawful
arrest or effecting an escape from custody."  Miss. Code Ann. § 99-19-101 (5)(e).

The aggravating factor of "avoiding a lawful arrest" requires proof beyond a reasonable doubt that evidence exists allowing a reasonable inference "that a substantial reason for the killing was to conceal the identity of the killer or killers or to 'cover their tracks' so as to avoid apprehension and eventual arrest by authorities." *Leatherwood v. State*, 435 So.2d 645, 651 (Miss. 1983); *see also Jackson v. Virginia*, 443 U.S. 307, 319 (1979) ("[T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." ); *United States v. Bernard*, 299 F.3d 467, 481 (5th Cir. 2002) (aggravating factors must be proven beyond reasonable doubt). A conviction which rests upon the adduction of insufficient evidence at trial is a violation of due process rights. *See Jackson,* 443 U.S. at 324. The determination of whether the aggravating factor was appropriately submitted requires a fact-specific analysis to determine whether credible evidence exists to support the jury's finding that the murder was committed for the purpose of avoiding or preventing arrest. *See, e.g.*, *Woodward v. State*, 726 So.2d 524, 541 (Miss. 1997).

Petitioner first argues that there is no case law precedent in Mississippi sustaining this aggravating factor where a potential witness other than an accomplice was left alive. (Pet. Memo 11). Petitioner argues Mrs. Harvey, a woman who had done business with Petitioner and could positively identify him, was knowingly left alive; therefore, avoiding arrest could not have been a "substantial reason" for Mr. Turner's murder. (Pet. Memo 11). Petitioner asserts that the remaining evidence is insufficient to support the finding of the aggravator, as he left evidence at the scene, confessed when questioned by authorities, and led police to evidence left near the crime scene. (Pet. Memo 12-13). Petitioner contends that the facts establish he shot into the air

and pellets scattered, thereby injuring the victims, and that Mr. Turner was shot only after he drew his own weapon. (Pet. Memo 13-14). Petitioner asserts these facts suggest the murder was the result of a botched robbery and not a killing to avoid arrest for the crime, and that the application of this particular aggravating factor is only proper where the evidence establishes the murder was an attempt to avoid "detection and arrest" for the robbery. (Pet. Memo 11-12, referencing, *e.g., Evans v. State*, 725 So.2d 613, 690 (Miss. 1997)). Respondents counter that the facts support the application of the factor, as Petitioner (1) planned the robbery; (2) hid the gun prior to the robbery; (3) laid in wait for the store to close; (4) shot both Mr. Turner and his daughter; and (5) fled to Memphis, Tennessee. (R. Memo 122).

In *Evans v. State*, which involved the rape and murder of a child by a defendant who befriended the family and deceived the mother in order to effectuate the child's abduction, the defendant argued that the aggravator was not appropriately applied, as "attempts to avoid detection *after* the killing, as occurred here, are arguably relevant only if there is some evidence that the defendant committed the offense in order to avoid detection." *Evans*, 725 So.2d at 689. He also asserted, in addition to insufficient evidence, that the aggravator was vague and overbroad, but the court found no limiting instruction was needed if evidence supported the instruction. *Id.* The court noted the defendant took the victim to a secluded area, taped her mouth, kept everything he used during the commission of the crime in his jeep to avoid leaving evidence at the scene, dumped the body in a secluded area, and disposed of the victim's clothing by the side of the highway. *Id.* at 690. The aggravator was supported, as "[t]he jury had before it evidence which indicated from the time Evans abducted Beatrice from her mother, he used special precaution to avoid detection or apprehension." *Id.*

In the case at bar, the court noted that the victims knew Petitioner, that Petitioner fired three shots, killing one witness and seriously injuring the other, that he left the murder weapon and box that had contained the money bag in a densely thicketed area, and that he threw the empty money bag in some weeds near a dirt road. *Wiley II*, 750 So.2d at 1206. The court found "there is evidence from which the jury could have reasonably inferred that a substantial reason for the murder was to conceal Wiley's identity, or cover his tracks, so as to avoid apprehension and eventual arrest. Therefore, the granting of the instruction on this aggravator was proper." *Id.* The court also individually considered the substantive claim of insufficient evidence on post-conviction review, and the Mississippi Supreme Court found there to be sufficient evidence to warrant a finding of this aggravator. *Id.* at 1210.

The "avoiding arrest" aggravator is properly considered if the motive for the murder is to avoid arrest for the commission of the underlying felony. *Gray v. Lucas*, 677 F.2d 1086, 1110 (5th Cir. 1982). In Petitioner's case, the jury heard testimony that Petitioner laid in wait for his victims, familiar to Petitioner, prior to emptying his weapon at them. Petitioner shot Mr. Turner twice - a scatter-shot to the back and a close-range, fatal shot to the chest. (Trial Tr. vol. 6, 455-56, January 24, 1995). Petitioner fled the scene, disposing of the murder weapon and money box in an almost unpenetrable thicket. (Trial Tr. vol. 6, 473). This Court cannot say the jury lacked credible evidence to support their finding that the "avoiding arrest" aggravating factor was warranted.[4] Petitioner has failed to prove the Mississippi Supreme Court was objectively

---

[4] The Court notes that in both *Scott v. State*, 878 So.2d 933, 981 (Miss. 2004) and *Chase v. State*, 645 So.2d 829, 857 (Miss. 1994), the jury found the aggravating factor of "avoiding arrest" warranted where the evidence supported a reasonable inference that the victims were murdered to allow the defendants' escape and avoid arrest, despite the fact that the wives of the victims, present at the time of the offenses, were left alive.

unreasonable in determining the evidence in this case was sufficient for a rational trier of fact to find the aggravator warranted. There exists no reasonable probability that proceedings against Petitioner would have resulted differently had this issue been raised on direct appeal; therefore, there can be no resulting prejudice from counsel's failure to raise the issue.

2. *If the "avoiding arrest" aggravating factor is broad enough to include the evidence in this case, then that factor is unconstitutionally overbroad.*

Petitioner next argues that if the evidence in this case establishes that he murdered to "avoid arrest," then the aggravating factor is impermissibly overbroad, as it fails to genuinely narrow the facts of this capital murder from any other capital murder. (Pet. Memo 15-16). Specifically, Petitioner argues that the only basis for the conclusion that he murdered to avoid arrest is that he killed a person who otherwise could have identified him, which is a fact established any time a defendant kills a witness. (Pet. Memo 15). Petitioner asserts that the failure of counsel to raise this argument was deficient and prejudiced Petitioner, as had it been raised, the death sentence would have been invalidated.

The injection of an unconstitutionally overbroad factor into the weighing scheme of capital sentencing requires invalidation of the sentence. *See Stringer v. Black*, 503 U.S. 222, 237 (1992). An aggravating factor must provide a "meaningful basis for distinguishing the few cases in which [the death penalty] is imposed from the many cases in which it is not." *Godfrey v. Georgia*, 466 U.S. 420, 427(1980) (quoting *Furman v. Georgia*, 408 U.S. 238, 313 (1972)); *see also Maynard v. Cartwright*, 486 U.S. 356 (1988). Therefore, an aggravating factor "must genuinely narrow the class of persons eligible for the death penalty and must reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of

murder." *Zant v. Stephens*, 462 U.S. 862, 877 (1983). The application of a vague aggravator is a violation of the Eighth Amendment because it "creates the risk that the jury will treat the defendant as more deserving than he otherwise might be by relying on the existence of an illusory circumstance." *Stringer*, 503 U.S. at 235.

The Mississippi Supreme Court rejected the argument that a limiting instruction must be given to narrow the "avoiding arrest" aggravator. *Wiley II,* 750 So.2d at 1207. The Fifth Circuit has specifically determined that Mississippi's construction serves to appropriately narrow the application of this factor to those defendants who purposefully killed their victim to avoid or prevent arrest for the commission of the underlying felony. *See Gray*, 677 F.2d at 1110. Petitioner attempts to distinguish his case from *Gray v. Lucas*, by arguing that all of the witnesses in that case were killed by the defendant after he completed the crime in order to avoid detection. This distinction is without merit given the steps taken by Petitioner to avoid being caught with the implements of his crime. Petitioner points the Court to no applicable precedent which would require a limiting factor for this aggravator, and the Fifth Circuit has determined Mississippi's sentencing scheme adequately narrows the application of this factor. Petitioner is entitled to no relief on this issue.

3. *The "avoiding arrest" factor is impermissibly duplicative of the "robbery" aggravating factor.*

Petitioner next argues that if the "avoiding arrest" factor is interpreted to include the facts of this case, then it is so broadly interpreted that it includes all murders committed during the course of a robbery. (Pet. Memo 17-18). *See* Miss. Code Ann. § 99-19-101(5)(d) (murder committed during commission of robbery). Petitioner cites *Booker v. State*, 699 So.2d 132, 136

(Miss. 1997), in support of his argument that the silencing of a potential witness who might have facilitated the defendant's arrest is true of every robbery murder, so that circumstance is already accounted for and weighed against the defendant by the application of the "robbery" aggravating factor. (Pet. Memo 18). Petitioner argues that counsel's failure to raise this claim was deficient and prejudiced him, as his sentence would have been reversed had the issue been raised. (Pet. Memo 18-19).

Respondents argue that Mississippi has a long-standing precedent that the "avoiding arrest" aggravator is not imposed without proof the defendant killed to "cover his tracks," and a capital defendant is not entitled to a limiting instruction on the "avoiding arrest" aggravator. *See*, *e.g.*, *Manning*, 735 So.2d at 350; *Bell v. State*, 725 So.2d 836, 858 (Miss. 1998), *cert denied*, 526 U.S. 1122, *reh'g denied*, 527 U.S. 1054 (1999); *Evans*, 725 So.2d at 689-90; *Holland v. State*, 705 So.2d 307, 355-56 (Miss. 1997), *cert. denied*, 525 U.S. 829, *reh'g denied*, 525 U.S. 1013 (1998). In light of that precedent, Respondents argue, Petitioner was unlikely to be afforded relief even if this issue had been raised with the court on direct appeal, thereby precluding a showing of prejudice. Respondents assert that there is no proper analogy between this case and *Booker*, as the latter involved the application of robbery and pecuniary gain aggravating circumstances. Respondents also argue that even if an analogy could be made between the avoiding arrest/robbery to robbery/pecuniary gain, the Fifth Circuit has ruled it would have to create a new rule in violation of *Teague v. Lane*, 489 U.S. 288, 310 (1989), to find constitutional error. *See* *Wiley v. Puckett*, 969 F.2d at 95-98 (5th Cir.1992).

In the context of ineffective assistance of counsel and on application for post-conviction relief, the Mississippi Supreme court held that "avoiding arrest" and "robbery" aggravators are

not the same, as more evidentiary support is required to support an instruction on the "avoiding arrest" factor. *Wiley II*, 750 So.2d at 1208. Therefore, there was no ineffective assistance of counsel as counsel's performance, even assuming deficiency, did not support a finding of prejudice. *Id.*

Under federal law, each aggravating circumstance must distinguish the class of defendants who are eligible for the death penalty. *See Zant*, 462 U.S. at 877. As long as narrowing is performed at either the guilt or sentencing phases, the aggravating factor's duplication of an element of the crime does not offend the Constitution. *See, e.g.*, *Williams*, 529 U.S. at 392; *Lowenfield v. Phelps*, 484 U.S. 231, 246 (1988). Petitioner's reliance on *Booker* is misplaced, as that case involved the application of robbery and pecuniary gain aggravating circumstances to an underlying felony of robbery. Petitioner has pointed to no case which holds it impermissible to use both the robbery and avoiding arrest aggravators in the same case, and Mississippi's scheme serves to narrow the class of persons eligible for the death penalty. Petitioner's claim that the aggravators are impermissibly duplicative is without merit.

Having addressed the substantive merits of this claim and finding no constitutional error, this Court finds that Petitioner's ineffective assistance of counsel claim must fail, as a finding of constitutional infirmity with regard to the underlying claim is necessarily required to meet the prejudice prong of *Strickland*. While this alone would preclude federal habeas relief on this issue, the Court will fully address the ineffective assistance of counsel claim on this issue without regard to the merit of the underlying claim. The United States Supreme Court has held that the failure to raise a claim on appeal objected to at trial could not be an "error of such magnitude that it rendered counsel's performance constitutionally deficient under the test of *Strickland*." *Smith*

*v. Murray*, 477 U.S. 527, 535 (1986).   In *Smith*, petitioner's counsel objected to testimony at trial and did not raise the related claim on appeal.  *Id.* at 534.  The Court, recognizing that the acceptance of an argument when the opportunity to raise the issue in state court was deliberately foregone would violate comity principles, failed to accept petitioner's argument that counsel's decision was made in ignorance of the claim's merit.  *Id.* at 535.  The Court found that argument "squarely foreclosed," as "the mere fact that counsel failed to recognize the factual or legal basis for a claim, or failed to raise the claim despite recognizing it, does not constitute cause for a procedural default."  *Id*. at 535 (citing *Carrier*, 477 U.S. at 486-87).

In addition, appellate counsel does not have to raise every nonfrivolous issue in order to meet the standard of effectiveness.  *See Green v. Johnson*, 160 F.3d 1029, 1043 (5th Cir. 1998); *West v. Johnson*, 92 F.3d 1385, 1396 (5th Cir. 1996).  It is often a strategic move to eliminate what counsel perceives, based on his experience, weaker arguments to avoid diluting the strength of his case.  *See Jones v. Barnes*, 463 U.S. 745, 752 (1983).  Moreover, with regard to Petitioner's third sub-issue under this claim, the United States Supreme Court has found counsel not ineffective for failing to object to an aggravating circumstance that duplicated the underlying felony.  *See Lockhart v. Fretwell*, 506 U.S. 364 (1993).

Having considered Petitioner's arguments under this claim of error, this Court finds that the decision of the Mississippi Supreme Court in regard to these claims does not represent a decision contrary to, or an unreasonable application of, clearly established Supreme Court precedent.  Petitioner is entitled to no relief on this claim of error.

B.      Sentencing & Appeal: Comments Regarding Parole

Petitioner asserts he received ineffective assistance of counsel at his resentencing trial

with regard to two issues involving references to parole: (1) that trial counsel failed to object to veiled references to the possibility of Petitioner's parole if he was not sentenced to death; and (2) appellate counsel failed to point out these references, contained in the record, to the Mississippi Supreme Court on direct appeal of the claim. While each of these claims has been given individual consideration, they are combined for purposes of the Court's analysis. Petitioner cites to three portions of the record in support of his ineffective assistance of counsel claim: (1) voir dire; (2) the cross-examination of three defense witnesses; and (3) the State's closing argument.

During voir dire, several venire members questioned the trial court extensively about whether Petitioner would be given parole if he were sentenced to life in prison.[5] (Trial Tr. vol. 4, 152-154, 159-162, January 23, 1995). The following excerpts from the trial transcript illustrate the venire's inquiries on the subject.

> Q. [DISTRICT ATTORNEY WILLIAMS:] But the point is under state law sentencing is individualized. Okay? You've got to hear the evidence, good and bad, about this man and what he did to Mr. Turner in August of 1981 before you can weigh it. There's no automatic death. There may be cases where the death penalty is not the proper punishment. There may be cases where it is. But in order to comply with state law, those elements have to be weighed by a jury. Okay? Yes, Sir?
> A. [Prospective Juror No. 32:] No. 32, Paul Cetto. Could you be a little more specific as to what process you're going to go through to have us arrive at this decision?

(Trial Tr. vol. 4, 150).

---

[5] The trial court sentenced Petitioner under an old version of the sentencing statute, which only provided the jury the option of sentencing a defendant to life imprisonment or death. Effective July 1, 1994, the statute was amended to provide the jury a third option of life imprisonment without the possibility of parole. *See* Miss. Code Ann. § 97-3-21. The record reveals Petitioner argued against the application of the amended sentencing statute as an *ex post facto* law, and the old version of the sentencing statute was applied. (Trial Tr. vol. 3, 60-68, January 23, 1995).

* * * * * *

Q.[DISTRICT ATTORNEY WILLIAMS:] We're going to have to show you the proof. Otherwise, I don't know how you could make a decision. Does that answer you?

A. Thank you.

Q. Yes, ma'am?

A. (Unidentified Prospective Juror) I have a question. Is this life with no parole or do they-will there be an opportunity for this jury to distinguish no parole as opposed to the death penalty?

THE COURT: The law says life in prison. The courts or the juries have absolutely nothing to do with parole laws. If the jury finds this person guilty, which has been done, if the jury sentences him to life, we don't know whether it's life with or without because that's up to the executive department. When a jury speaks and when the Court sentences, we're through with that part of it.

Q. [DISTRICT ATTORNEY WILLIAMS]: Ma'am, does that-

A. I didn't know if there was an alternative of no parole.

A. (Unidentified Prospective Juror) So he could get out after 20 years?

THE COURT: I think the jury must-I can't answer those type questions. I think the jury is just going to have to approach it as the prosecutor has been saying-take this, take this and weigh it and make your decision based upon the way you see the evidence, not upon some uncertainty unknown down the road which you have no control over and I have no control over and just call it the way you see it at the conclusion of the trial. That's the only thing we can do. All those contingencies, I don't know what the answers are, nor does anyone else.

I would go back just a minute. I think [the District Attorney] is about to wind down here. If you went back 20 or 30 years ago, the Legislature in Jackson determined what cases carried the death penalty. That didn't make any allowance for local feelings or decisions. Now, if a certain offense falls within this category, then it's up to the people in DeSoto County up here to determine whether that's a vote death penalty case or a life in prison case. It individualizes rather than a big body like the Legislature trying to speak for the state as a whole. It gives the local people an opportunity to take into consideration the crimes and also take into consideration the defendant himself and everything that can be legally admissible about him where you can make the decision based upon all the evidence that can be made available to you rather than just having a category. I don't know whether that helped you or not, but it will never be taken away from you. You will be the ultimate decision makers.

(Trial Tr. vol. 4, 152-53).

* * * * * *

[DISTRICT ATTORNEY]: Anybody else having problems with the death penalty?

Yes, Ma'am?

A. (Ms. Deborah Buckley). No. 183.

Q. Ms. Buckley?

A. I just have a question. If the jury decides-does not unanimously decide for the death penalty and life imprisonment is the decision, who-when is-when is it justified-when would it ever be decided that it would definitely be life without parole? I was under the impression that decision could be made in lieu of the death penalty. And what I'm understanding you to say is that the death penalty is not the choice-there is a possibility that he would be given life imprisonment with parole as a possibility. Is that what you're saying?

THE COURT: That's a possibility, yes.

PROSPECTIVE JUROR DEBORAH BUCKLEY: But no jury has the right to say that it's life without parole?

THE COURT: The current status of the law is I'll instruct you as to exactly what the law says now, and that is if you prescribe death, that's your decision; if you prescribe life in prison, that's your decision. Those are the two options that I'll be-

PROSPECTIVE JUROR DEBORAH BUCKLEY: So that is an option?

THE COURT: Yes. It will be in clear black and white print just like I said it just then.

A. (Ms. Margaret Yates) Is that like a hole in the law? To me-I don't know the circumstances of the case or what happened, and if I look at this case and see that I think this man would be a menace to society for the rest of his life and I don't vote for the death penalty but life imprisonment, I would be inclined more to vote for the death penalty because I don't know if he's going to get out. Is this a-

THE COURT: What is your number ma'am?

PROSPECTIVE JUROR MARGARET YATES: Oh, I'm sorry, 182.

THE COURT: Ms. Yates,  let me try to help you if I can. I don't know whether I can or not.

PROSPECTIVE JUROR MARGARET YATES: That kind of bothers me.

THE COURT: I understand that, but you're just exactly like I am and just like the lawyers on both sides. We have to take the law as we find it today, and we have to work with it as we find the law today.

PROSPECTIVE JUROR MARGARET YATES: So even if we vote for life imprisonment, we're not guaranteed life in prison.

THE COURT: No, ma'am. You'll be doing exactly what the law says. That's what the law says. If there's parole down the road somewhere, I don't have any control of it. I can't guess. I can't second guess it nor can you.

PROSPECTIVE JUROR MARGARET YATES: Okay. That's somebody else's job.

THE COURT: The Legislature prescribes the punishment, and once we do that, our job ends, and I'm not a soothsayer; I don't know what's down the road nor do you. We'll just follow the law as the Legislature and the Supreme Court tells us it is today and do the best we can.

Q. [THE DISTRICT ATTORNEY WILLIAMS]:Anybody else? Yes, sir?

PROSPECTIVE JUROR DAN BRIGHT: No. 52, Dan Bright.  In other words, what you're saying, Your Honor, is that if given the choice of life imprisonment or the death penalty, if the jury went with life in prison, the defendant could get out tomorrow, he could be paroled tomorrow technically?

THE COURT: Well, not tomorrow.
PROSPECTIVE JUROR DAN BRIGHT: Well, as soon as the trial is over, as soon
as he goes back to jail?
THE COURT: Well, at some point in time, possibly yes, I don't know. The
sentencing statute says life in prison.

(Trial Tr. vol. 4, 159-162).

Petitioner argues that the discussion on voir dire set the stage for the prosecutor to impermissibly

argue the parole issue through veiled references throughout witness testimony and in closing

argument. Petitioner contends that his counsel failed to file a reply brief on direct appeal to the

State's assertion that there was no prejudicial discussion of parole during the course of the trial,

thereby rendering constitutionally deficient performance by failing to cite what he asserts as the

numerous references to parole during witness testimony and in closing argument. (Pet. Memo

23).

Petitioner cites the cross-examination of three defense witnesses in support of his

argument. First, Dr. Bill Fox, a psychologist, testified on Petitioner's behalf, and Petitioner

asserts the prosecutor's questions implied Petitioner would kill again if released. (Pet. Memo 23).

On direct examination, Dr. Fox was questioned as to Petitioner's prognosis, and Dr. Fox stated he

was of the opinion that Petitioner's prognosis was "good" provided the appropriate structured

treatment could be put into place. (Trial Tr. vol. 6, 552, January 25, 1995). On cross-

examination, the prosecutor questioned Dr. Fox regarding his belief that Petitioner suffered from

"weak internal controls," such as below-average IQ, a learning disability, and drug/alcohol

dependence, in order to attempt to demonstrate those were not mitigating factors in this case.

(Trial Tr. vol. 6, 553-68). In response to Dr. Fox's statement that weak internal controls

combined with substance abuse likely led to Petitioner's uncharacteristic behavior, Petitioner

cites the following exchange as an uninvited, impermissible reference to Petitioner's future

dangerousness.

> Q.    That's the point.  It could have then, and it could now?
> A.    Yeah, I - -
> Q.    There's no way that your science can predict human behavior, is there?
> A.    No.  I would - - if I'm agreeing with you, I would agree with you that Mr. Wiley needs to stay away from any kind of substance abuse, any kind of alcohol, or this type of behavior can occur again.
> Q.    And there's absolutely no way that you can ensure that he won't be an abuser, is there?

(Trial Tr. vol. 6, 567).

Next, Petitioner cites the cross-examination of Dr. Robert Ritter, a neuropsychiatrist who

testified on Petitioner's behalf.  On direct examination, Dr. Ritter testified Petitioner was not a

sociopath given to an antisocial pattern of behavior.  (Trial Tr. vol. 6, 574-75, January 25, 1995).

Dr. Ritter testified that Petitioner's substance abuse created an upset in the interaction between

the "animal brain" and "thinking brain" that could have caused aberrant behavior.  (Trial Tr. vol.

6, 575-76).  On cross-examination, Dr. Ritter testified Petitioner suffered from no brain damage

or disease, but that he had consistently ingested intoxicating substances for such a lengthy period

of time that he suffered from an addiction and compulsion to obtain the addictive substances.

(Trial Tr. vol. 7, 579-80, 582).  Upon further questioning, Dr. Ritter stated it was likely Petitioner

was controlled by the animal portion of his brain during the two weeks Petitioner was in hiding

from the police.  (Trial Tr. vol. 7, 590).  The exchange regarding the "animal brain" led to the

series of questions Petitioner now cites as calculated questions to ensure the jury knew Petitioner

could be paroled if not sentenced to death.  (Pet. Memo 25).  The complained of exchange is as

follows:

> Q.    Yes.  So we could, in fact, say Wiley acted out his old brain predatory

22

instincts on August 22, 1981, when he robbed and murdered Mr. Turner
and blinded his daughter?

A.     That would be true because at that time he had a diminished cerebral activity,
cerebral ability.

Q.     Yes, sir.  And, of course, since that time, Mr. Wiley has been in custody?

A.     Yes, sir.

Q.     And, hopefully, he has not had access to any of these substances which he enjoys
since he's been arrested.

A.     I would assume that to be true, and I think it is true, sir.

(Trial Tr. vol. 7, 590-91).

\*\*\*\*\*\*

Q.     [I]f he had access to alcohol or narcotics or any of these other substances,
because of his lack of inner control he would return right to those abuses,
wouldn't he?

A.     He does have that tendency, as I see it.

Q.     Which means?

A.     A person who has been addicted to a substance in the past is more likely to
return to that substance than you or I.

Q.     Which means that Wiley is capable of repeating this whole process?

A.     Yes, sir.

(Trial Tr. vol. 7, 591-92).

Finally, the cross examination of Rev. Ronald Padgett, Director of Religious Programs at

Mississippi State Penitentiary, is cited as an allusion to a parole reference.  (Pet. Memo 25-26).

Rev. Padgett testified to his good experience with Petitioner and his belief that Petitioner was

repentant of his crimes.  (Trial Tr. vol. 7, 599).  On cross-examination, the following testimony

was elicited:

Q.     Of course, [prison is] a fairly structured environment, is it not?

A.     Sure.  Yes, it is.

Q.     There's no - - of course, inmates don't have access to drugs or alcohol or
shouldn't have?

A.     Okay, shouldn't have.

Q.     It's a whole lot different than an outside environment?

A.     Yes, it is.

(Trial Tr. vol. 7, 601).

With regard to the portion of his claim concerning the prosecutor's closing argument,

Petitioner cites the following passages as error:

> Well, I've seen a lot of psychiatrists and a lot of psychologists take this witness
> chair and others throughout this state and elsewhere, and I guarantee you one
> thing: They can't tell you what is a killer by instinct and what isn't. As the good
> doctor said, the science of the human mind is not an exact science. You can't look
> at a guy and say he's going to kill or not.

> And with all due respect for Mr. Jones' statement that this was a one-time thing,
> this was a one-time thing, there is no proof to support it. You don't know, I don't
> know, Judge Baker don't know, the Turners don't know, Mr. Kelly don't know,
> Mr. Wiley's lawyers don't know, his family don't know whether it's a one-time
> thing or not and perhaps he don't know.

(Trial Tr. vol. 7, 698).

*****

> And we all know, as the good doctor said, what the success rate of treatment is,
> about 75 percent failure, so to sit up here and tell you that this was a one-time
> thing, there's no proof to support it. They want to talk about me getting into
> speculation, to get up here and tell you that there's proof to support the theory that
> it's a one-time thing is more speculation than I've engaged in. There is no way
> anybody can tell you what's in a human mind and what it's going to do.

(Trial Tr. vol. 7, 699).

Petitioner asserts that the combination of witness testimony and closing argument

regarding what Petitioner might do if he came into contact with drugs or alcohol were references

to the possibility of parole, seized upon by the prosecution from the comments made during voir

dire. (Pet. Memo 27). Petitioner contends trial counsel's failure to object to these references and

appellate counsel's failure to demonstrate to the Mississippi Supreme Court that the references

were veiled parole remarks resulted in the jury's consideration of arbitrary factors that prejudiced

him. (Pet. Memo 35-36). Petitioner argues that Mississippi case law explicitly prohibits the

24

mention of the possibility of parole at the sentencing phase of a capital murder case, with the exception of habitual offender cases. *See Banks v. State*, 725 So.2d 711, 718 (Miss. 1998) (prosecutors cannot argue defendant's "future dangerousness"); *Balfour v. State*, 598 So.2d 731, 748 (Miss. 1992) (propensity for future dangerousness not legitimate consideration in capital case); *Williams v. State*, 445 So.2d 798, 813 (Miss. 1984) (references to possibility of parole inject arbitrary factors into sentencing proceedings of capital murder trial). Petitioner asserts such arguments "impermissibly penalize defendants for offenses they have not committed" and "promote speculation and arbitrary sentencing by the jury." (Pet. Memo 34-35). Petitioner argues that counsel was ineffective, and Mississippi's failure to apply its own law in finding counsel's performance constitutionally adequate is an unreasonable application of clearly established law, as Petitioner was denied his due process rights based on statements deemed improper by the highest court of this State. Petitioner maintains that the conclusion that parole was never commented on during the trial was an error in factual determination. (Pet. Memo 28). Petitioner asserts that the court relied upon this unreasonable factual determination on post-conviction review and determined there was no merit to the substantive claim, thus, no ineffective assistance of counsel. (Pet. Memo 28).

The Mississippi Supreme Court, on direct appeal, found that comments made to the jury by the trial judge during voir constituted an exception to the State rule that parole should not be mentioned in a capital sentencing proceeding. *Wiley I*, 691 So.2d at 961-65. The court considered Petitioner's argument that the jury was improperly informed Petitioner might be paroled if given a life sentence, an issue the jury was prohibited from considering at that time under statute and case law. *Id.* at 963. The court distinguished Petitioner's case from other cases

holding it error for a jury to consider the issue of parole, as the trial judge in Petitioner's case repeatedly informed the jury of the language of the statute, gave accurate information to the jurors who had questions, and properly instructed the jury prior to sentencing. *Id.* at 964. Moreover, the three prospective jurors who questioned the applicability of parole did not sit on the jury. *Id.* The court reasoned:

> The trial judge followed this Court's instructions to not speculate on parole. He emphasized that the trial court and the jury had no control over parole. When further pressured by the veniremen for a more exact answer, the trial judge gave a truthful response. Moreover, at the close of the presentation of evidence, the trial judge properly instructed the jury regarding the options of life and death. The trial judge's actions in this case did not constitute reversible error; therefore, Wiley's claim on this point is without merit.

*Id.*

The court also considered Petitioner's argument that the prosecutor was arguing Petitioner had a prior criminal record, an unsupported implication, when he commented that this crime was not a "one-time thing." *Id.* at 964-65. The court noted defense counsel argued in closing argument that Petitioner was not a killer and stated "[t]his was a one-time thing, as bad as it is, and I know it's bad, but it's not characteristic of this person." *Id.* at 965. The court found that the prosecutor's argument was supported by the record evidence of medical expert testimony that Petitioner could perpetrate another crime if under the influence of alcohol, and that the statement was made to rebut defense counsel's own statement. *Id.* Viewing the comment in context of the entire argument, the court held Petitioner's argument without merit. *Id.*

On post-conviction review, Petitioner's claim was first considered in the context of trial counsel's failure to object to the State's references during voir dire, witness examination, and in closing argument. The court recapped its decision on direct appeal regarding the voir dire issue

and determined the issue res judicata, as Petitioner was seeking to argue the same merits by couching the claim as ineffective assistance of counsel. *Wiley II*, 750 So.2d at 1200. The court noted that the argument had been rejected on its merits on direct appeal, thereby precluding a finding of deficiency or prejudice. *Id.* Regarding the discussion during voir dire, the court noted that "trial counsel moved for a mistrial, and to quash the jury panel. When these efforts failed, it is difficult to see what more trial counsel could have done." *Id.*

Next, the court considered trial counsel's failure to object to alleged parole references during witness examination. The court found there to be no reference to parole in the examination of Dr. Fox. *Id.* at 1200-01. The court similarly found there to be no mention of parole in the exchange with Dr. Ritter, and further noted the cross-examination questions explored the substance abuse problems Dr. Ritter testified to on direct examination. *Id.* at 1201. The court found no reference to parole in the testimony of Rev. Padgett and noted the prosecutor appeared to be impeaching the witnesses' testimony about Petitioner's model behavior in prison through questions to explore how well Rev. Padgett knew Petitioner. *Id.* at 1202. The court determined these exchanges were not parole references but were rebuttal evidence and argument to the testimony elicited on direct examination from these witnesses. *Id.* Further, the court found there to be no prejudice proved, even if deficiency could be assumed. *Id.*

The court next considered Petitioner's claim of ineffective assistance of counsel in the context of the prosecutor's closing argument. Petitioner asserted that trial counsel was ineffective for failing to object on the proper grounds to the prosecutor's argument regarding the crime not being a "one-time thing," as the argument was not a comment on prior offenses but on future dangerousness. *Id.* at 1202. The court noted that the claim of improper references to prior

criminal behavior was rejected on direct appeal as inaccurate and unsupported. *Id.* at 1203. The court found that the matter had already been ruled on, though it acknowledged the ruling was in a different context. *Id.* The court also found a contemporaneous objection had been made, and that the comments were not references to parole but proper rebuttal comments. *Id.* The court held there to be no demonstration of deficiency and prejudice that would entitle Petitioner to relief on his ineffective assistance of counsel claim. *Id.*

The court also considered whether appellate counsel was ineffective for failing to point out to the court that the record contained comments Petitioner argued could only be properly construed as parole references. The court found that the argument the comments were parole references was without factual support and determined no prejudice was proved. *Id.* at 1208.

The Mississippi Supreme Court has fully considered the claim of ineffective assistance of trial and appellate counsel as it relates to parole comments on voir dire and alleged possibility of parole comments during witness testimony and in closing argument. With regard to the voir dire comments, trial counsel raised the claim both at trial and on direct appeal, where it was rejected. No basis for a claim of ineffective assistance of counsel claim exists on this issue. Additionally, the failure of trial counsel to object, or appellate counsel to raise on appeal, the issues regarding witness testimony and closing argument has likewise been considered and rejected both substantively and as ineffective assistance of counsel. The court did not find the exchanges to be comments on the possibility of parole. This factual determination has not been sufficiently rebutted by Petitioner, as both the cross-examination questions and closing argument were found to be proper rebuttal. These references were not the explicit parole references condemned by prior Mississippi case law precedent. Moreover, even if deficiency were assumed, Petitioner has

demonstrated no prejudice stemming from trial counsel's failure to object or appellate counsel's

failure to raise this claim on appeal.  Petitioner has failed to demonstrate an unreasonable

determination of facts or an unreasonable application of *Strickland* precedent on this issue.  He is

entitled to no relief on this claim.

C.      Sentencing: "Send a Message"

During closing argument, the prosecutor urged the jury:

> Now, I think it's high time that we have a citizen reaction.  It should be made clear to
> William and to everyone else for that matter that the laws of this county are going to be
> severely enforced with the most severe penalty when our innocent victims, our blameless
> victims are slaughtered, are blinded, whose lives are wrecked without any fault of their
> own.  We out to make it crystal clear.

(Tr. Tr. vol. 7, 701, January 26, 1995)

******

> [F]olks who do these things. . . should be held responsible for their actions.  My
> God, we're not barbarians. . . Folks need to understand that when you commit
> crime like this, you're going to be held accountable.  It's just that simple.

(Trial Tr. vol. 7, 697).

The Mississippi Supreme Court considered this claim on post-conviction review in the

context of ineffective assistance of counsel and noted that prosecutors are cautioned from making

such arguments, but it acknowledged that recent case law held the caution inapplicable to the

sentencing phase of a capital murder case.  The court stated:

> We choose not to fault the prosecution for arguing that the "message" conveyed by
> a death penalty verdict would be different than that urged by the defense.  To do so
> would be disingenuous given the inescapable reality that deterrence is, in fact, an
> established goal of imposing the death penalty, which necessarily entails, to some
> extent, sending a message.

*Wiley II*, 750 So.2d at 1205 (citing *Wells v. State*, 698 So.2d 497, 513-514 (Miss. 1997)).

The court determined, therefore, that even if there was deficient performance by counsel, there was no resulting prejudice. *Id.*

Petitioner asserts that this argument served to inflame the jury and to urge consideration of arbitrary factors, and that trial counsel's failure to lodge an objection or to request a mistrial fell below reasonable representation. (Pet. Memo 31-32). Petitioner argues that the decision of the Mississippi Supreme Court was unreasonable, inasmuch as *Wells* was a fact-specific finding that defense counsel "opened the door" to the prosecution's argument by requesting that the jury consider what type of message would be sent if a mentally retarded individual were sentenced to death. (Pet. Memo 33). Moreover, Petitioner argues, even if *Wells* were broad enough to encompass this case, it is still contrary to the requirement that individualized determinations regarding death sentences be made free from emotion. (Pet. Memo 34). *See also Gardner v. Florida*, 430 U.S. 349, 358 (1977) (Court holding that sentence of death to be "based on reason rather than caprice or emotion"); *Zant*, 462 U.S. at 879 ("an individualized determination" of circumstances surrounding crime and particular characteristics of defendant required).

Respondents counter that *Wells* and post-*Wells* decisions reinforce the State law standard that prosecutors are allowed to argue that the imposition of death penalty will send a deterrent message. (R. Memo 47, citing, *e.g., King v. State*, 784 So.2d 884, 889-90) (Miss. 2001) (expressly overruling prior precedent stating such argument in sentencing phase of trial would be error)). Respondents argue that it would not have been error to overrule an objection had one been made, so Petitioner cannot make the required proof of prejudice. (R. Memo 49). Respondents argue that there is no applicable precedent Petitioner can cite with regard to this claim, therefore, it would violate the *Teague* doctrine for this Court to rule in his favor. (R.

Memo 51).

Without merit in the substantive claim, counsel cannot have rendered deficient performance in failing to object, and no prejudice results from that failure. *See Mayabb v. Johnson*, 168 F.3d 863, 869 (5th Cir. 1999); *Jackson v. Johnson*, 150 F.3d 520, 525-26 (5th Cir. 1998); *Ricalday v. Procunier*, 736 F.3d 203, 208 (5th Cir. 1984). The right at issue in this argument is the right to a fair trial, and the question is whether the comments "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)). Petitioner must show he was substantially prejudiced by the comments in order to prove a violation of the right. *See Darden*, 477 U.S. at 183 & n.15 (comments not constitutional error unless trial rendered unfair). The Supreme Court has recognized that jurors are authorized to "express the conscience of the community on the ultimate question of life or death." *Witherspoon v. Illinois*, 391 U.S. 510, 519 (1968). The prosecutor's comments, taken in the context of the entire closing argument, demonstrate the prosecution's attempt to rebut Petitioner's contention that the shootings were accidental and isolated. The comments cannot be said to have denied Petitioner a fair trial, as there exists no reasonable probability that Petitioner would not have been sentenced to death absent the comments. Petitioner is entitled to no relief on this claim.

E.     Sentencing: Failure to Oppose Elimination of Mercy and Sympathy from Jury's
       Consideration

Petitioner's next claim of error centers around the trial court's denial of proposed jury instructions involving the terms "mercy" and "sympathy," based on what Petitioner alleges as

the trial court's erroneous interpretation of the Mississippi Supreme Court's findings in *Mack v. State*, 650 So.2d 1289, 1330-31 (Miss. 1994) (defendant has no entitlement to mercy instruction at sentencing). While going over proposed jury instructions, defense counsel objected to a proposed instruction, asking the court to amend the instruction to find a life sentence could be imposed even if the aggravating circumstances outweighed the mitigating circumstances. (Trial Tr. vol. 7, 638). The prosecution, arguing against amending the instruction, cited the trial court to the Mississippi Supreme Court decision in *Mack*. (Trial Tr. vol. 7, 638). Neither defense counsel nor the trial court had read the decision, and the trial court seemingly understood the decision to prohibit such an instruction. (Trial Tr. vol. 7, 638-640).[6]

Petitioner asserts *Mack* held only that a trial court has the discretion whether to give a "mercy instruction" in a capital case, and that trial counsel did not know whether *Mack* prohibited the jury instruction. (Pet. Memo 39-40). Petitioner alleges that trial counsel's failure to know the law prevented counsel's correction of the trial court's misunderstanding of the issue, thereby preventing the jury from recognizing its ability to consider mercy and sympathy in consideration of Petitioner's fate. (Pet. Memo 40). This failure, Petitioner argues, fell below an objective standard of reasonable representation without strategic justification, and was extremely prejudicial in light of the persuasive mitigating evidence that would have elicited sympathy from the jury had they been aware it could have been considered. (Pet. Memo 40-41). Petitioner cites to evidence presented of his abusive childhood, his Intelligence Quotient ("IQ") less than 80,

---

[6] This is exemplified by the trial court's statement "I thought the law was it could be given or not given and it wouldn't be error either way." (Trial Tr. vol. 7, 640, lines 19-21). In considering a later proposed instruction, the court stated, "D-2 will be refused. It's a mercy instruction - - again, under the Mack case. I was going to grant the instruction." (Trial Tr. vol. 7, 642, lines 13-15).

that he was hard worker, a loving father, and his honorable discharge from the military.  (Pet. Memo 40).  Petitioner also notes the evidence showed he was addicted to alcohol and drugs and was intoxicated the night of the murder.  (Pet. Memo 40-41).  Additionally, Petitioner argues, the evidence showed he was repentant of his crime and had become extremely involved in prison ministry and activities, and had been a model prisoner who was even trusted by prison officials to be a "Hall Man" on death row.  (Pet. Memo 40-41).  But for counsel's failure to inform the court of the properness of the instruction, Petitioner argues, the jury would have considered mercy and sympathy, and the rejection of this claim on post-conviction was a decision was contrary to the established law that mercy is a properly considered sentencing factor for the jury. (Pet. Memo 42).

The Mississippi Supreme Court considered Petitioner's claim of ineffective assistance of counsel for failing to oppose the elimination of mercy and sympathy from the jury instructions and found it a "huge analytical leap" from failing to oppose jury instructions to the complete elimination of mercy and sympathy from a jury's consideration.  *Wiley II*, 750 So.2d at 1203-04. The court noted that United States Supreme Court and Mississippi precedent do not require a mercy instruction be given.  *Id.* at 1204.  Recognizing that a jury may be instructed not to be swayed by emotion, the court noted that a "catch-all" instruction, allowing the jury's consideration of "any other aspect of the defendant's character or record, and any other circumstance of the offense brought before them during the trial, which the jury, deemed to be mitigating on behalf of the defendant" was given.  *Id.*  The court also noted that the "catch-all" instruction regarding mitigating circumstances had been long-approved "to encompass any mitigating circumstances not specifically enumerated under Miss. Code Ann. § 99-19-101(6)."

*Id.* Additionally, the court noted the record revealed that counsel did argue for the instruction; he just did not succeed. *Id.* at 1203. Therefore, the court found that even if trial counsel was deficient with regard to the proposed jury instruction argument, Petitioner was not prejudiced, as he had no right to a mercy instruction. *Id.* at 1204.

It is well-settled that a jury cannot be precluded from considering mitigating factors related to a defendant's character or the circumstances of his crime in determining whether the defendant should receive "a sentence less than death." *See Lockett v. Ohio*, 438 U.S. 586, 604 (1978). However, in *Saffle v. Parks*, 494 U.S. 484 (1990), the Supreme Court considered whether a jury could be instructed to reach a sentencing decision discounting sympathy. In *Saffle*, the Court rejected the notion that an antisympathy instruction encouraged jurors' interpretation of the instruction as barring consideration of sympathetic mitigating evidence. *Id.* at 492. *Saffle* drew the "distinction between allowing the jury to consider mitigating evidence and guiding their consideration. It is no doubt constitutionally permissible, if not constitutionally required, . . . for the State to insist that 'the individualized assessment of the appropriateness of the death penalty [be] a moral inquiry into the culpability of the defendant, and not an emotional response to the mitigating evidence." *Id.* at 492-93 (citing *California v. Brown*, 479 U.S. 538, 545 (1987)). While a State cannot prevent the consideration of mitigating evidence, "it need not grant the jury the choice to make the sentencing decision according to its own whims or caprice." *Id.* at 493.

Petitioner had no entitlement to a mercy instruction. Moreover, trial counsel did argue for the instruction at issue, and the court's instructions allowed the jury's consideration of

mitigating evidence. If a misinterpretation regarding *Mack* occurred, it was not prejudicial given that the jury was properly instructed as to mitigating and aggravating circumstances.[7] Therefore, even if counsel was deficient for failing to object to the trial court's alleged misunderstanding of *Mack*, Petitioner was not prejudiced by the failure, as he was not entitled to such an instruction in the first place. Petitioner has failed to prove the decision of the Mississippi Supreme Court was contrary to established Supreme Court precedent or an unreasonable application of same.

F.      Trial Counsel's Failure to Investigate and Present Crucial Mitigation Evidence

Petitioner asserts trial counsel failed to adequately investigate and present substantial mitigating evidence through three potential witnesses, and as such, he lost an opportunity to elicit sympathy and mercy from the jury. (Pet. Memo 51-53). Specifically, Petitioner cites as error the failure of counsel to present the testimony of Diane Wiley, Petitioner's estranged wife, and John Thacker, Petitioner's childhood friend. (Pet. Memo 51-52). Petitioner asserts a third witnesses, JoAnn Butler, his grandmother who reared him, was only allowed an opportunity to present superficial testimony that belied the wealth of mitigating evidence she could have provided. (Pet. Memo 51).

Respondents assert that this claim is barred on federal habeas review, due to the imposition of two adequate and independent state procedural bars. *See* Miss. Code Ann. § 99-

---

[7] The jury was instructed that "[a]ny other matter, any other aspect of the Defendant's character or record, and any other circumstance of the offense brought before you during the trial of this cause which you, the Jury, deem to be mitigating on behalf of the Defendant" could be considered. (Trial Tr. vol. 1, 147, Instruction C-3). They were also instructed to consider mitigating circumstances, which "may also stem from any fact connected with the circumstances of the offense or the offender - - the defendant's background, his age, his experience, his character, his demeanor, his family or any other facet of his life - - that you believe or feel weighs against a sentence of death." (Trial Tr. vol. 2, 159, Instruction D-7).

39-5(2) (post-conviction application must be filed within one year after conviction) and Miss. Code Ann. § 99-39-27(9) (successive petitions bar). Respondents assert that it was the failure of post-conviction counsel to include this claim in the original post-conviction application; therefore, Petitioner must demonstrate cause and prejudice, by way of ineffective assistance of post-conviction counsel, in order to vitiate the procedural bar. (R. Memo 136). Respondents assert Petitioner cannot meet this burden, as there is no right to the effective assistance of counsel on post-conviction review. Moreover, Respondents argue, the Mississippi Supreme Court alternatively found that the underlying ineffective assistance of counsel claim was without merit. (R. Memo 139-40). Therefore, they argue, Petitioner cannot here demonstrate cause and prejudice sufficient to overcome the procedural bars regarding this claim.

In reply, Petitioner argues that it was not until after the Mississippi Supreme Court's decision in *Jackson v. State*, 732 So.2d 187, 188 (Miss. 1999), that he had a legal basis to assert the denial of investigatory funds as grounds for relief. (Reply 17). Petitioner contends the denial of funds rendered him unable to investigate, and it was only after "a very limited investigation" with the assistance of pro bono counsel that Petitioner was able to uncover the mitigating evidence he now presents to the Court. (Reply 18). Petitioner asserts this issue is not procedurally barred, as it is based on facts which were previously undiscoverable. (Reply 18). *See also* Miss. Code Ann. § 99-39-23(6)) (excepting from successive petition bar cases involving previously undiscoverable evidence "of such a nature that it would be practically conclusive that had such been introduced at trial it would have caused a different result in the conviction or sentence").

The Mississippi Supreme Court held Petitioner's claim barred and otherwise without

merit. *Wiley III*, 842 So.2d at 1286. The court noted that the affidavits attached to the petition failed to reveal any information that was not presented through the testimony of witnesses who testified at Petitioner's resentencing trial. *Id.* The court held that Petitioner failed to show counsel was deficient or that prejudice resulted from counsel's failure to call these witnesses, and that the issue was otherwise without merit. *Id.* The court also addressed Petitioner's claim that *Jackson* represented an "intervening decision" that would vitiate the procedural bar, and it determined Petitioner "had more than one opportunity to present an argument under *Jackson*" and failed to do so.[8] *Id.* Moreover, the evidence presented to the court was not found to be new evidence undiscoverable at the time of trial or sufficient to allow a different result if it had been introduced. *Id.*

Petitioner fails to persuade the Court that he is entitled to have this claim reviewed, as it is barred on independent and adequate State law grounds. *See, e.g.*, *Coleman*, 501 U.S. at 750; *see also Moore v. Roberts*, 83 F.3d 699, 703 (5th Cir. 1996) (no evidence Mississippi inconsistently applies time bar); *Sones v. Hargett*, 61 F.3d 410, 417 (5th Cir. 1995) (Mississippi time bar adequate and independent state law ground); *Johnson v. Puckett*, 176 F.3d 809, 815 n. 3 (5th Cir. 1999). In order to overcome the imposition of the procedural bar, Petitioner must demonstrate cause and prejudice, which he fails to do. Petitioner cannot argue the ineffectiveness of post-conviction counsel to demonstrate "cause," as there is no right to counsel on state post-conviction review. *See Ogan v. Cockrell*, 297 F.3d 349, 357 (5th Cir. 2002) (no "cause" where there is no right to counsel); *Beazley v. Johnson*, 242 F.3d 248, 271 (5th Cir.

_____

[8] *Jackson* was decided January 28, 1999, prior to the denial of Petitioner's petition for post-conviction relief and subsequent rehearing, which were denied, respectively, on June 3, 1999, and February 3, 2000.

2001). Similarly, Petitioner's argument regarding *Jackson* fails to provide him with relief, as he has not persuaded that it was an "intervening decision" or that his claim is based on previously undiscoverable facts.

Although not necessary to the disposition of this claim, the Court finds this issue otherwise without merit. The affidavits attached to the second post-conviction application, which are also attached to the current petition, fail to present any new, significant evidence that was not introduced at trial. Mrs. Wiley's affidavit establishes she would have testified as to Petitioner's difficult family history and childhood, head injuries he suffered, his attempts at suicide, and his qualities as a husband and father. (Pet. Memo 52, Ex. A). Mrs. Butler would have testified that she acted as a parent to Petitioner while his mother struggled with mental and emotional problems, Petitioner's physical and mental deficiencies in childhood, the exposure to traumatic events he has endured, and to his "quiet and loving nature." (Pet. Memo 52, Ex. B). Mr. Thacker would have provided character evidence of Petitioner's kindness toward others. (Pet. Memo 53, Ex. C). The Court has reviewed the information that was presented at trial and determines that the substance of the "omitted" information was submitted to the jury through the testimony of those individuals who did testify at trial.[9] Therefore, the Court finds the issue

_____

[9] The presented testimony included: Mississippi Department of Corrections Record Custodian, Ann Evans (Trial Tr. vol. 6, 521-23, January 25, 1995); Dr. Gary Mooers (Trial Tr. vol. 6, 523-34); Dr. Billy Fox (Trial Tr. vol. 6, 537-552); Dr. Robert Ritter (Trial Tr. vol. 6-7, 569-91); Parchman Penitentiary Unit Administrator, Jessie Streeter (Trial Tr. vol. 7, 594-96); Rev. Ronald Padgett (Trial Tr. vol. 7, 597-600); grandmother, JoAnn Butler (Trial Tr. vol. 7, 602-607); friend, Melvin Banks (Trial Tr. vol. 7, 607-608); mother-in-Law, Fairstine Delvridge (Trial Tr. vol. 7, 609-610); friend, Shirley Mae Lewis (Trial Tr. vol. 7, 610-613); friend, Katherine Isom (Trial Tr. vol. 7, 613-615); sons, Kelvin and Columbus Wiley (Trial Tr. vol. 7, 616-620); Sergeant Diane Jackson (Trial Tr. vol. 7, 621-622); and school records custodian, Wendell Davis (Trial Tr. vol. 7, 623-625).

procedurally barred and otherwise without merit. Petitioner is entitled to no relief on this claim.

## II.     Jury Consideration of Parole & State Argument on Parole

Petitioner alleges a violation of his Eighth and Fourteenth Amendment rights in two separate claims of error regarding parole comments, the facts of which are fully laid-out in Petitioner's ineffective assistance of counsel claim on these issues.[10] *See* discussion *supra* Part I.B. Petitioner argues that he was denied his federal due process rights by Mississippi's failure to abide by its own law, which at the time of his sentencing trial prohibited the sentencing jury's consideration of the possibility of parole in a capital murder case unless the defendant was an habitual offender. (Pet. Memo 42-43). Specifically, Petitioner asserts that the discussion during voir dire, the "thinly veiled" references to the possibility of parole during trial, and the questioning of witnesses regarding what Petitioner might do if he had access to alcohol or drugs, all culminated in the prosecutor's prejudicial closing argument when he argued against the crime being a "one-time thing." (Pet. Memo 43). Petitioner asserts the Mississippi Supreme Court's interpretation of the events on direct appeal - that the only parole references came during voir dire - constitutes an unreasonable determination of facts regarding the statements at issue. (Pet. Memo 43-44).

First, the Court notes that the only direct references to the possibility of parole were made as a result of the inquiries of prospective jurors. Prior to Petitioner's case, the decisions of the Mississippi Supreme Court established that consideration of parole by a jury was improper. *See, e.g.*, *Williams*, 445 So.2d at 812-14. Respondents contend that the Mississippi Supreme Court

---

[10] These claims have been considered independently but are consolidated for purposes of the Court's analysis.

properly interpreted this prior precedent in distinguishing this case, as Petitioner's case involved a previously unaddressed factual scenario. This Court agrees. On direct appeal, the Mississippi Supreme Court acknowledged its prior precedent that the consideration of parole in a case not involving an habitual offender was forbidden. *Wiley I*, 691 So.2d at 963. The court distinguished Petitioner's case from its seminal decision on the issue of parole consideration, *Walter Williams, Jr. v. State*, and held there to be no reversible error in the trial judge's actions. *Wiley I*, 691 So.2d at 964. The court determined that in Petitioner's case, the trial judge followed the Mississippi Supreme Court's "instructions to not speculate on parole." *Id.* Second, he made it clear to the jurors that parole was a legislative function. *Id.* Third, he responded truthfully to inquiries from the jurors. *Id.* Finally, he gave proper instructions regarding sentencing options. *Id.* On post-conviction review, the matter was held barred from reconsideration based on the doctrine of res judicata. *Wiley II*, 750 So.2d at 1210; *see also* Miss. Code Ann. § 99-39-21(3) (res judicata applicable "to all issues, both factual and legal, decided at trial and on direct appeal").

Whether to allow the mention of parole in a capital sentencing proceeding is a matter of state law; the absence of such a mention is not a federal constitutional requirement. *See O'Dell v. Netherland*, 521 U.S. 151, 158 (1997); *Simmons v. South Carolina*, 512 U.S. 154, 168-69 (1994); *California v. Ramos*, 463 U.S. 992, 1014 (1983) (whether sentencing jury is informed of parole eligibility is matter of state law). As there is no precedent from the Supreme Court holding it to be error to mention parole in capital sentencing proceedings, there is no conflict with precedent in the decision of the Mississippi Supreme Court. *See Mitchell v. Esparaza*, 540 U.S. at 11; *see also Pulley v. Harris*, 465 U.S. 37, 41 (1984) (writ does not issue "on the basis of

a perceived error of state law"). As a constitutional issue is not raised by the consideration of parole eligibility, Petitioner must demonstrate he was denied a fundamentally fair trial by the comments in order to establish an error that would entitle him to relief. *See Donnelly*, 416 U.S. at 643. The jury was properly instructed on the law regarding parole and repeatedly informed it was not an issue for the jury's consideration. Petitioner fails to persuade the Court he is entitled to relief on this issue.

Next, the Court considers Petitioner's argument that parole was improperly mentioned during the questioning of witnesses. The Mississippi Supreme Court considered this argument in the context of ineffective assistance of counsel and determined there was no mention of parole in the exchanges. *Wiley II*, 750 So.2d at 1202. Specifically, the Mississippi Supreme Court determined Petitioner's cited references as parole comments was an inaccurate reading of the record. *Id.* The court went on to note that the questions were in response to testimony given by the witnesses during direct examination, and that no prejudice resulted from counsel's failure to object to the questions. *Id.* at 1200-02.

This issue was not presented in State court, and it would now be barred under Miss. Code Ann. § 99-39-5(2) (time bar), 99-39-21(1) (failure to raise bar), and 99-39-27(9) (successive petition bar). As there is no relief available to Petitioner in State court on this issue, the claim may be considered technically exhausted and is barred for federal habeas review purposes unless Petitioner can demonstrate cause for the default and resulting prejudice, or that a fundamental miscarriage of justice would result from the imposition of the bar. *See, e.g., Gray v. Netherland*, 518 U.S. 152, 161-62 (1996); *Coleman v. Thompson*, 501 U.S. at 735 n.1, 750. As previously discussed, Petitioner's claim of ineffective assistance of counsel is insufficient to establish cause

and prejudice; therefore, the claim is barred. However, even without the imposition of a procedural bar, this claim would fail. The cross-examination at issue was geared to impeach the witness testimony and in rebuttal to the direct-examination testimony, and not the type of impermissible parole references that would render proceedings against Petitioner unfair.

The Mississippi Supreme Court also imposed a procedural bar to the consideration of Petitioner's claim regarding the prosecutor's "one-time thing" comment during the course of closing argument. On direct appeal, a claim was made regarding the comment, but for different grounds than those presented in state post-conviction or in federal habeas review. Petitioner's argument on direct appeal was that the prosecutor's comment was a reference to Petitioner's prior criminal record. *Wiley I*, 691 So.2d at 964-65. On state post-conviction review, Petitioner "switched theories" and claimed the "one-time thing" argument was a comment on the possibility of parole. The Mississippi Supreme Court refused to consider the claim under the state post-conviction statute, as it was presented as a different legal theory than initially raised, and the court held the claim barred on the basis of Miss. Code Ann. § 99-39-21(1) (failure to raise bar) and Miss. Code Ann. § 99-39-21(2) (different theory bar). *Wiley II*, 750 So.2d 1209. In an alternative addressing of the merits, the court found the comment was not a comment on parole and was made in rebuttal to defense counsel's remarks. *Id.* As previously noted, Petitioner's claim of ineffective assistance of counsel is insufficient to sustain this claim. Petitioner has failed to demonstrate cause and prejudice sufficient to overcome the imposition of the procedural bar, or that fundamental unfairness has resulted.

Petitioner argues that, to the extent procedural bars were imposed by the Mississippi Supreme Court, the bars are inapplicable to this issue due to their inconsistent applications. (Pet.

Memo 49 n. 18). When not regularly or consistently followed, a state procedural bar does not prevent federal review. *See Ford v. Georgia*, 498 U.S. 411, 423-24 (1991). A state procedural rule is presumed adequate when used by a state court to make an unambiguous denial of relief, but a petitioner may rebut the presumption by demonstrating the rule is not regularly applied by the state. *See Sones*, 61 F.3d at 416-417. Petitioner bears the burden of demonstrating that the contemporaneous objection bar was not regularly applied at the time his appeal was decided, and that the bar was not applied to claims similar to his own. *See Sones*, 61 F.3d at 416; *Amos v. Scott*, 61 F.3d 333, 340 (5th Cir. 1995). Petitioner cites to *Manning v. State*, 735 So.2d 323, 348-49 (Miss. 1999) (no bar applied to reviewing sufficiency of evidence supporting aggravating factor) and *Mickell v. State*, 735 So.2d 1031, 1035 (Miss. 1999) (no bar applied in cases of alleged prosecutorial misconduct) in support of his argument. The Court finds it unnecessary to delve into a lengthy discussion distinguishing these cases and notes only that neither of these cases involved a petitioner seeking to raise an issue under a different legal theory than that raised on direct appeal. This claim is barred from review.

Even without the imposition of the procedural bar with regard to witness questioning and closing argument, this claim fails. The discussion during voir dire, the questioning of witnesses, and the closing argument of the prosecutor contain none of the direct mentions of parole condemned by the Mississippi Supreme Court. The record reveals that the jury was correctly instructed, and the questioning and argument of the prosecutor was proper rebuttal. The Mississippi Supreme Court's findings have not been shown to be unreasonable, nor has Petitioner sustained his burden with regard to the court's identification or application of Supreme Court precedent. Petitioner is entitled to no relief on this claim.

### III.  Diminished Capacity Jury Instruction

Petitioner argues that the introduced evidence of his diminished mental capacities, which included the fact that he had sustained head injuries as a child and was under the influence of drugs and alcohol at the time of the murder, entitled him to a "diminished capacity" mitigating instruction at sentencing.  (Pet. Memo 44).  Petitioner argues that the trial court's refusal to grant a statutory mitigating instruction on this factor was error, and that the Mississippi Supreme Court made an unreasonable determination of facts in light of the extensive evidence produced to support the factor when it affirmed the trial court's finding.[11]  (Pet. Memo 45).  Petitioner alleges that his cerebral functioning was affected by drugs and alcohol at the time of the killing, and that his limited mental capacity, when sober, was sufficient to allow a jury to reasonably infer that he lacked capacity to appreciate "the criminality of his conduct or to conform his conduct to the requirements of the law."  *See* Miss. Code Ann. § 99-19-101(6)(f).  Petitioner asserts the instruction's refusal amounted to an unconstitutional preclusion of the jury's consideration of a statutory mitigating factor the jurors were required to weigh, thereby violating his right to be free from a capricious imposition of the death penalty.  (Pet. Memo 46).

On direct appeal, the Mississippi Supreme Court noted that "diminished capacity" is a statutory mitigating factor under Mississippi law and affirmed that Petitioner was entitled to an instruction on the mitigator if it was supported by the evidence.  *Wiley I*, 691 So.2d at 965-66.  However, the court found the instruction unsupported by the evidence.  *Id.* at 965.  Drawing the comparison between Petitioner's factual circumstances and those of the defendant in *In re Hill*,

---

[11] The refused instruction at issue is Instruction D-8(c), which reads, in part, that "[t]he capacity of William Wiley to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was substantially impaired."  (Trial Tr. vol. 2, 171).

460 So.2d 792 (Miss. 1984), the court noted that both had a low IQ and suffered difficulties in school, had suffered the death of someone close to them, and had sustained head trauma. *Id.* at 966. The court found that the evidence did not establish that these factors caused either individual to have a diminished capacity at the time the crime was committed. *Id.* The court noted "[t]he difference between Wiley and Hill is that Wiley became addicted to alcohol and drugs." *Id.* at 966. The court commented, "[t]he only evidence of Wiley's alleged diminished capacity at the time of the crime is the doctor's testimony that Wiley's substance abuse problem caused Wiley to suffer 'a diminished cerebral activity, cerebral ability" at the time of the crime. However, there is no evidence that Wiley was substantially impaired in his capacity to appreciate the criminality of his conduct and to conform his conduct to the requirements of the law." *Id.* [12]

In a footnote, Petitioner attempts to distinguish this case from *In re Hill*, as that case focused on IQ and mental capacities in the distant past, while Petitioner argues his history combined with evidence he was intoxicated at the time of the killing is evidence of specific drug-related impairments. (Pet. Memo 45 n. 15). However, a review of the record reveals that when defense counsel argued for the inclusion of the mitigating instruction, the trial judge stated:

> I don't think there's been any proof to support a diminished capacity. The proof is he drank some that day, took some pills that day and lost his money in a crap game and planned the murder. That's the proof before the jury. . . . It's not any proof in the record of how much he drank that day, when he quit drinking, whether it was that morning or that evening or anything.

(Trial Tr. vol. 7, 635-636).

Respondents assert that the jury was instructed that any factor could be considered in

---

[12] On post-conviction review, the court refused to allow Petitioner to relitigate the claim based on the doctrine of res judicata. *Wiley II*, 750 So.2d at 1210; *see also* Miss. Code Ann. § 99-39-21(3).

mitigation, and Petitioner was not prevented from providing proof of diminished capacity nor the jury from considering that proof. (R. Memo 95-96). A review of the granted instructions reveals that two "catch-all" instructions were given by the trial court. Instruction C-3 instructed the jury that "[a]ny other matter, any other aspect of the Defendant's character or record, and any other circumstance of the offense brought before you during the trial of this cause which you, the Jury, deem to be mitigating on behalf of the Defendant" could be considered. (Trial Tr. vol. 1, 145-149). The court also instructed the jury that there was "no exhaustive list" of the mitigating factors, but that "any fact connected with the circumstances of the offense or of the offender" could be considered in deciding whether to forego the imposition of the death penalty. (Trial Tr. vol. 2, 159, Instruction D-7). Moreover, defense counsel's closing argument specifically argued the mitigating factors that were contained in proposed Instruction D-8 without objection from the prosecution. (*See* Trial Tr. 7,688-690, January 26, 1995).[13]

At the sentencing phase of a capital murder case, a defendant must be permitted to introduce mitigating evidence, the nature of which may include "any aspect of a defendant's character or record or any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *Lockett v. Ohio*, 438 U.S. at 604. However, a court is not obligated to give an instruction where the proof of the mitigating circumstance lacks evidentiary support. *See Delo v. Lashley*, 507 U.S. 272, 277 (1993).

This Court finds that the decision of the Mississippi Supreme Court was not an

---

[13] Defense counsel argued Petitioner's lack of a significant history of criminal activity, his lack of subsequent history of criminal activity, his diminished capacity due to alcohol use and borderline intelligence, his youth at age of offense, his military service, the fact he has been a model prisoner, that he has expressed remorse for his crime, that he cooperated with the police, that he believes in God, and the effect of Petitioner's death on his family as mitigating factors.

unreasonable application of clearly established Supreme Court precedent, a decision contrary to such precedent, nor an unreasonable determination of facts in light of the evidence presented. At the time of his trial, Petitioner did not prove an entitlement to the grant of the instruction, and the Mississippi Supreme Court was not unreasonable in refusing to grant a diminished capacity instruction on the basis of a history of drug and alcohol abuse. Even if the refusal to grant the instruction could be considered error, the United States Supreme Court has long-approved of "catch-all" instructions of the type given in this case to cure any deficiency in jury instructions. *See Brown v. Payton*, 544 U.S. 133 (2005); *Boyde v. California*, 494 U.S. 370 (1990). Petitioner is entitled to no relief on this issue.

## IV. Proportionality

Mississippi law requires the Mississippi Supreme Court to review the record in cases where the death penalty has been imposed to determine "whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant." *See* Miss. Code Ann. § 99-19-105(3)(c). Petitioner argues the court's proportionality review in this case violated his constitutional rights, as the facts of this case, together with the mitigating circumstances presented at trial, reflect a robbery gone awry. (Pet. Memo 48). Petitioner asserts that since a proportionality review is required by Mississippi law, inconsistent application of the review implicates Petitioner's right to be free the arbitrary or capricious imposition of the death penalty. (Pet. Memo 48).

On direct appeal, the Mississippi Supreme Court found:

A review of other cases indicates that, considering the crime and the defendant, the death penalty in this case was proportionate. A review of other cases indicates

that, considering the crime and the defendant, the death penalty in this case was proportionate. *See Cabello v. State*, 471 So.2d 332, 350 (Miss.1985) (death sentence was proportionate where defendant strangled and robbed business owner); *Evans v. State*, 422 So.2d 737, 739 (Miss.1982) (death penalty was proportionate where defendant waited 30 minutes for business to be free of customers before robbing and shooting store attendant); *Booker v. State*, 449 So.2d 209, 222 (Miss.1984) (death penalty was proportionate where defendant shot and robbed business owner); *Conner v. State*, 632 So.2d 1239, 1265 (Miss.1993) (death sentence was proportionate where defendant had intelligence quotient "on the low side of 'average' ", evidence was contradictory as to whether defendant was schizophrenic amnesiac); *Lanier v. State*, 533 So.2d 473, 492 (Miss.1988) (death sentence was proportionate where defendant was mildly mentally retarded, suffered hallucinations, and had been institutionalized twice for alcoholism and drug abuse). *Neal v. State*, 451 So.2d 743, 763 (Miss.1984) (death sentence was proportionate where defendant had troubled childhood and was institutionalized at age 10 due to family and learning difficulties and was severely retarded with mental ability of 8-year-old child). Therefore, Wiley's claim that the death sentence is disproportionate in this case is without merit.

*Wiley I*, 691 So.2d at 967.[14]  Petitioner asserts that the cases cited by the Mississippi Supreme Court "may have been analogous to the circumstances of Wiley's case" but assert "no single, entire case cited by the court involved as much mitigating evidence, or as little aggravating evidence, as is present in this case."  (Pet. Memo 48).

Respondents argue that proportionality reviews are not mandated by the United States Constitution, and that this issue is one of state law.  (R. Memo 99).  *See Pulley*, 465 U.S. at 41; *McCleskey v. Kemp*, 481 U.S. 279, 306-08 (1987); *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990).

A state system of capital punishment that channels the jury's discretion by consideration of particularized characteristics of both the defendant and the offense presumes no constitutional violation in the sentence's imposition.  *See McCleskey*, 481 U.S. at 308.  This Court is not

_____

[14] This issue was also raised on state post-conviction review, where it was held without merit and res judicata.  *Wiley II*, 750 So.2d at 1210.

required to "look behind" a state court's finding of proportionality to avoid the arbitrary or capricious imposition of a death sentence when the state procedure sufficiently guides the sentencer. *See Walton v. Arizona*, 497 U.S. 639, 655-56 (1990). The Mississippi Supreme Court rejected this claim without a departure from precedent such that this claim, even if it could be construed by this Court to constitute error, was not denial of due process. *See Pulley*, 465 U.S. at 41-42; *Donnelly*, 416 U.S. at 642 (absent specific constitutional violation, federal habeas review limited to consideration of whether error "so infected the trial with unfairness as to make the resulting conviction a denial of due process"). Petitioner is entitled to no relief on this claim.

## V.      Mercy and Sympathy

Petitioner argues that the trial court's mistaken belief that it was prohibited from providing a mercy instruction violated Petitioner's Eighth and Fourteenth Amendment rights, and that this omission was especially prejudicial in light of the evidence presented to the jury which would have supported a finding of mercy. (Pet. Memo 50). Specifically, Petitioner argues that the trial court's omission of mercy and sympathy language from the jury instructions, which the jury relied upon as detailed and specific guidance, is "tantamount to instructing the jury that it may not consider these factors." (Reply 13). Further, Petitioner argues that Mississippi failed to apply its own precedent by striking these references from the jury instructions, thereby depriving him of his federal due process rights. (Reply 12).

Respondents argue this claim is barred from consideration, as it was held barred by the Mississippi Supreme Court on post-conviction review. *See Wiley* II, 750 So.2d at 1209; Miss. Code Ann. § 99-39-21. Respondents concede that the precise grounds for the basis of the bar is

ambiguous, as the Mississippi Supreme Court stated, "[p]ostconviction relief is not granted upon facts and issues which could or should have been litigated at trial and on appeal. 'The doctrine of *res judicata* shall apply to all issues, both factual and legal, decided at trial and on direct appeal.'" *Id*. The Mississippi Supreme Court, without vitiating the procedural bar, discussed the merits of this claim in the alternative and found the argument of Petitioner to be a mischaracterization of both law and fact. *Id*. at 1209-10. The court determined that while a jury may not be told to completely disregard sympathy, there is no right to a sympathy instruction and a trial judge has the discretion to instruct the jury "against being swayed by such considerations." *Id*. at 1209.

An unambiguous denial of relief on state law grounds that are independent of federal law and adequate to support the judgment precludes this Court's consideration of the claim. *See, e.g., Coleman*, 501 U.S. at 729; *Harris*, 489 U.S. at 262-63. Here, the court clearly found the claim barred for failure to raise the issue at trial and/or on direct appeal. However, just as the merits of this claim were addressed in the context of ineffective assistance of counsel and found to be without merit, so are they here. *See* discussion *supra* Part I.E. Petitioner was not precluded from presenting mitigating evidence to the jury for its consideration, and he does not have a federal constitutional right to a mercy instruction. *See Johnson v. Texas*, 509 U.S. 350, 371-72 (1993); *Saffle*, 494 U.S. at 492-94. Petitioner is entitled to no relief on this claim.

## VI.     Send a Message Argument

Petitioner asserts that the prosecutor improperly urged the jury to abandon individualized sentencing considerations and urged a "statement to the community at large" by his "send a

message" argument at sentencing.[15]  (Pet. Memo 50).  Petitioner argues the tactic violated his

Eighth and Fourteenth Amendment rights by denying him a fair sentencing determination.  *See*

*Lockett*, 438 U.S. at 605 ("The nonavailability of corrective or modifying mechanisms with

respect to an executed capital sentence underscores the need for individualized consideration as a

constitutional requirement in imposing the death sentence."); *Zant v. Stephens*, 462 U.S. at 879.

The Mississippi Supreme Court held this issue barred on post-conviction review, as it was not

raised on direct appeal.  *Wiley II*, 750 So.2d at 1210; *see also* Miss. Code Ann. § 99-39-21(1).

Alternatively, the court determined that the merits would likewise fail, as Mississippi law does

not deem it error to make a "send a message" argument during the sentencing phase of a capital

murder case.  *Id*.  Petitioner asserts Mississippi failed to apply its own law in allowing the

argument, as *Wells v. State*, 698 So.2d 497 (Miss. 1998), cited by the Mississippi Supreme Court

in alternatively dismissing the merits of this claim, did nothing to change that it is improper for

"send a message" arguments to be used to argue for a death sentence.  (Reply 12-13).

The imposition of an adequate and independent state procedural bar precludes this

Court's review of the claim.  *See, e.g.*, *Coleman*, 501 U.S. at 750.  Moreover, there is no specific

constitutional prohibition against the type of argument made by the prosecutor in this instance.

*See Mitchell*, 540 U.S. at 17 (in absence of "clearly established Federal law" federal court may

not overrule state court for holding different opinion).  Mississippi case law permits a "send a

message" argument during the sentencing phase of a capital murder trial.  *See Wells*, 698 So.2d

at 513, *King*, 784 So.2d at 889-90.  The jury in this case was instructed according to a statutory

scheme designed to channel discretion so as to avoid an arbitrary or capricious imposition of the

---

[15] The argument made by the prosecutor is cited in the Court's discussion of this issue in Part I, *supra*.

death sentence. The Court finds that, given the circumstances of the crime, the evidence of guilt, and Petitioner's confession, there exists no reasonable likelihood he would have received a lesser sentence had this argument been omitted. *See, e.g, Jones v. Butler*, 864 F.2d 348, 356 (5th Cir. 1988) (finding petitioner "must demonstrate that the misconduct is persistent and pronounced or that the evidence of guilt was so insubstantial that the conviction could not have occurred but for the improper remarks" in order to establish inflammatory remarks denied petitioner due process). Petitioner has failed to persuade this Court that this argument deprived him of any rights protected under the United States Constitution. Petitioner is entitled to no relief on this issue.

## VII. Avoiding Arrest Aggravating Factor

Petitioner argues that his Eighth and Fourteenth Amendment rights were violated by the unconstitutional application of the "avoiding arrest" aggravating factor, as (1) it is not factually supported by the record; (2) its application in this case constitutes an unconstitutionally overbroad construction; and (3) the construction impermissibly double-counts the robbery aggravating factor. (Pet. Memo. 50).[16]

On post-conviction review, the Mississippi Supreme Court found Petitioner's arguments regarding the "avoiding arrest" factor to be procedurally barred for failure to raise the issue on direct appeal and without making the requisite showing of cause and prejudice to overcome the imposition of the procedural bar. The court alternatively held that this argument would fail on the merits, which the court discussed in considering this claim in the ineffective assistance of counsel context. *Id.*

---

[16] The specific points of argument raised by Petitioner are comprised in this Court's discussion of the aggravating factor in the ineffective assistance of counsel context. *See* discussion *supra* I.A.

This claim is similarly barred on federal habeas review. *See, e.g.*, *Coleman*, 501 U.S. at 750. However, this claim would fail on the merits even if no procedural bar were imposed. The facts support the application of the aggravating factor, as Petitioner (1) planned the robbery; (2) hid the gun prior to the robbery; (3) laid in wait for the store to close; (4) shot both Mr. Turner and his daughter; and (5) fled to Memphis, Tennessee. The Fifth Circuit has addressed the "avoiding arrest" aggravating factor and found it not overbroad. *See Gray*, 677 F.2d at 1109-10 (finding Mississippi "has construed this aggravating circumstance to refer to purposefully killing the victim of an underlying felony to avoid or prevent arrest for that felony"). Even if the factors could be considered duplicative, the United States Supreme Court has held that there is no constitutional error in having an aggravating circumstance duplicate the underlying felony to raise the crime to capital murder. *See Tuilaepa v. California*, 512 U.S. 967, 972 (1994) ("The aggravating circumstance may be contained in the definition of the crime or in a separate sentencing factor (or in both)."); *Lowenfield*, 484 U.S. at 246; *see also Fretwell*, 506 U.S. at 372. Moreover, even if a proper analogy could be made between the avoiding arrest/robbery and robbery/pecuniary gain factors, the Fifth Circuit has ruled a new rule would have to be created to find constitutional error, thereby violating the nonretroactivity doctrine of *Teague v. Lane*. *See Wiley*, 969 F.2d 86, 95-98 (5th Cir. 1992). Petitioner is entitled to no relief on this claim.

## VIII.  Failure to Define Elements of Underlying Felony (Robbery) for Jury

Petitioner argues that the jury had to find beyond a reasonable doubt that the crime of robbery occurred in order to impose the aggravating circumstance that the crime occurred during the commission of a robbery, but that the jury was not instructed on the elements of the crime at

his resentencing trial. (Pet. Memo 51). Petitioner contends the failure to instruct the jury prevented the jury from making a finding that robbery actually occurred and resulted in a sentence imposed in violation of his constitutional rights. (Pet. Memo 51).

No objection regarding the failure to instruct the jury on the elements of robbery was raised at Petitioner's resentencing trial, and this claim has never been presented to the State courts for review. As it would now be barred under Miss. Code Ann. § 99-39-5(2) (time bar), 99-39-21(1) (failure to raise bar), and 99-39-27(9) (successive petition bar), return to state court would be futile; therefore, the claim may be considered technically exhausted and barred for federal habeas review purposes unless Petitioner can demonstrate cause for the default and resulting prejudice, or that a fundamental miscarriage of justice would result from the imposition of the bar. *See, e.g.*, *Gray v. Netherland*, 518 U.S. 161-62; *Coleman v. Thompson*, 501 U.S. at 735 n.1, 750. In order to otherwise allow review of his claim, Petitioner bears the burden of demonstrating the bar is not strictly or regularly followed. *See Stokes v. Anderson*, 123 F.3d 858, 860 (5th Cir. 1997). Petitioner fails to so persuade and this claim is, therefore, barred from federal habeas review.

However, even if the claim were not barred, it would be without merit. The guilt phase of Petitioner's trial has been affirmed by the Fifth Circuit, and the State was entitled to rely on the conviction as proof of the aggravating circumstance at sentencing. The verdict during the guilt phase of Petitioner's trial was properly introduced at sentencing to support the aggravating factor, as a jury does not have to be instructed on the elements of the underlying felony if it received proper instructions during the guilt phase of the trial. *See Williams v. State*, 684 So.2d 1179, 1187-92 (Miss. 1996); *Irving v. State*, 441 So.2d 846, 849 (Miss. 1983). Petitioner has

suffered no prejudice from the trial court's failure to instruct on the underlying felony. *See*

*Williams*, 283 F.3d 272, 281 (5th Cir. 2002) (finding that "unlike a conviction determination, the

sentencing jury is not required to focus on each element of [the underlying felony], but instead

on weighing the aggravated nature of the [underlying felony] against the mitigators." ). The jury

was not required to find the elements of robbery again at resentencing, and Petitioner is entitled

to no relief on this claim. *See Lowenfield*, 484 U.S. at 246 (aggravating circumstance may be in

definition of crime and/or in separate sentencing factor).

## IX.     Mississippi Supreme Court's Refusal to Grant Investigative Funds

Petitioner moved the Mississippi Supreme Court to appoint counsel and grant

investigative funds during state post-conviction proceedings and was denied funds. Petitioner

asserts that this denial, in spite of his indigence, violated the Due Process and Equal Protection

Clauses of the Fourteenth Amendment of the United States Constitution, as well as Mississippi

law. (Pet. Memo 56). *See, e.g.*, *Hicks v. Oklahoma*, 447 U.S. 343, 346 (1980) (voluntary

creation of substantial right or expectation by state cannot be deprived arbitrarily by state due to

Fourteenth Amendment protection); *Jackson v. State*, 732 So.2d at 190 (inmates on death row

entitled to funds to investigate facts and claims outside appellate record). Although

acknowledging there is no constitutional right to counsel in post-conviction proceedings,

Petitioner asserts *Jackson* established a guarantee to investigative funds on state post-conviction

review as it has become "an integral part of the Mississippi death penalty appeals process." (Pet.

Memo 56-57).

This issue was raised for the first time in Petitioner's second application for state post-

conviction relief, where the Mississippi Supreme Court held the claim procedurally barred by

Miss. Code Ann. § 99-39-27(9) (successive writ bar) and Miss. Code Ann. § 99-39-5(2) (time bar). *Wiley III*, 842 So.2d at 1282 (Miss. 2003).[17] Petitioner argues this claim is timely, as it was raised after the court's decision in *Jackson*, where prior to that decision, such motions for compensation and litigation expenses were denied. (Reply 17). Petitioner notes that while Mississippi law generally prohibits the filing of successive post-conviction applications, there exists two applicable exceptions in the statute: (1) that his motion is based on newly discovered evidence that could not be presented in the first habeas petition due to the denial of his request for investigative assistance which rendered him unable to investigate his ineffectiveness claims; and (2) that *Jackson* represents an "intervening decision" that would have impacted his sentence. (Reply 17). *See also* Miss. Code Ann. § 99-39-23(6).

The Mississippi Supreme Court considered both of these exceptions to the imposition of the above-mentioned procedural bars and found neither exception applicable. *Wiley III*, 842 So.2d at 1283. At the time the Mississippi Supreme Court decided this issue, Petitioner was represented by Robert McDuff, who was appointed as counsel by the United States District Court, Northern District of Mississippi, on McDuff's motion to vacate the appointment of prior counsel and substitute himself, pro bono. *Id.* at 1282. Mr. McDuff, with co-counsel, filed for state post-conviction relief on Petitioner's behalf, which was denied by the Mississippi Supreme Court June 3, 1999. *See Wiley II*, 750 So.2d 1193 (Miss. 1999). On June 9, 1999, Petitioner filed a motion for rehearing and a motion for appointment of counsel in the event a rehearing

---

[17] Respondents note Petitioner's Eighth and Fourteenth Amendment claims were presented to the state court only upon the second state post-conviction application, almost three years after the Mississippi Supreme Court denied his motion to appoint present counsel. (R. Memo 153).

was not granted by the court, the later of which presented a claim for the appointment of counsel under *Jackson*. (Pleadings vol. No. 1998-DR-0588). Both the petition and the motion were denied by the court on February 3, 2000. (Pleadings vol. No. 1998-DR-0588).

Although the court denied this claim based on the imposition of the successive petition and time bars, the Mississippi Supreme Court included a discussion of the merits to fully address Petitioner's argument that an exception to the bar applied. *See Wiley III*, 842 So.2d at 1283-84.

> As stated previously, Wiley's present counsel, McDuff, filed a motion to vacate the appointment of Levidiotis and substitute himself as counsel "without payment" in the United States District Court in 1998. Present counsel also represented Wiley on his last PCR in this Court, which was denied June 3, 1999. The motion for rehearing was denied February 3, 2000. Wiley centers much of his argument around *Jackson v. State,* 732 So.2d 187 (Miss.1999), which allowed appointment of counsel and consideration of reasonable litigation expenses. However, the motion in *Jackson* was granted January 28, 1999, which was prior to the denial of both Wiley's PCR and his motion for rehearing. Wiley has already raised the argument of this "intervening decision" with this Court via his motion for rehearing and separate motion for appointment of counsel and for litigation expenses; now he is essentially seeking a rehearing of that motion under the guise of a post-conviction claim by combining it with a "new" claim of ineffective assistance of counsel.

*Id*. at 1283.

The court then went on to note that there was no Sixth Amendment right to counsel in state post-conviction proceedings, and that Jackson was entitled to the benefit of compensated counsel due to the inability of Mississippi inmates to obtain qualified counsel or assistance from institutional lawyers. *Id.* at 1284. The court distinguished Petitioner's case, as Jackson did not have adequate representation, while Petitioner had "been adequately represented by different lawyers at every state of the process. Furthermore, he is represented by the same counsel who represented him on his last PCR. Surely the assertion is not now that counsel will do a better job the second time around if compensated." *Id.* at 1284. The court went on to note that *Jackson* did

not require litigation expenses to be paid but remanded the matter to the trial court. *Id.* Also, the court determined the request in *Jackson* was for a specific purpose, while Petitioner merely made a broad request without specifying need or intended use. *Id.* The court found " no right to litigation funds for a fishing expedition, especially when there is no indication of any fish to be caught. This is Wiley's second post-conviction petition. He has already been heard on the issues he now seeks to raise yet again." *Id.* As there is no constitutional right to counsel on state post-conviction, the court found Petitioner had no liberty interest in the claim nor resulting constitutional violation. *Id.* at 1285.

This claim is barred from federal habeas review due to the imposition of an independent and adequate state procedural bar. *See Sones*, 61 F.3d at 416-19; *Moore*, 83 F.3d at 703; *Johnson*, 176 F.3d at 815 n.3. Petitioner has not demonstrated cause to overcome the imposition of the procedural bar, and even if ineffective assistance of counsel regarding failure to bring this claim in a timely manner were to be considered, it is insufficient to establish cause. *See Coleman*, 501 U.S. at 752-53 (Court holding that there is no constitutional right to counsel in state post-conviction proceedings); *see also* Ogan, 297 F.3d 349, 357 (5th Cir. 2002) (attorney error in filing state habeas appeal late "cannot be constitutionally ineffective"); *see also* Lewis v. Casey, 518 U.S. 343, 377 (1996) (economic parity not required by Fourteenth Amendment and no right to counsel in state post-conviction proceedings). The alternative discussion of the merits further precludes a demonstration of prejudice for the reasons set forth by the Mississippi Supreme Court. Petitioner is entitled to no relief on this claim.

**X.     Atkins v. Virginia**

In *Atkins v. Virginia*, 536 U.S. 304, 321 (2002), the United States Supreme Court held

that the execution of offenders with mental retardation[18] is proscribed by the Eighth Amendment to the United States Constitution.  The Court noted that the imposition of the death penalty serves the dual societal purposes of deterrence and retribution, and that unless one of these may be furthered by its imposition, the death penalty constitutes cruel and unusual punishment. *Atkins*, 536 U.S. at 319.  The Court found that mentally retarded individuals are less culpable, therefore, a death sentence to one without the requisite culpability fails to adequately narrow the use of the death penalty.  *Id.*  Further, the Court noted that deterrence may only be realized when the murder is deliberate and premeditated, factors which are diminished in mentally retarded offenders, as their characteristics, including impairments in behavior and cognition "make it less likely that they can process the information of the possibility of execution as a penalty and, as a result, control their conduct based on that information."  *Id.* at 319-20.

In *Atkins*, the Court did not provide a definition of mental retardation to guide courts addressing this issue, though it did cite the mental health community's diagnostic criteria for a diagnosis in noting that  "clinical definitions of mental retardation require not only subaverage intellectual functioning, but also significant limitations in adaptive skills such as communication, self-care, and self-direction that became manifest before age 18."  *Id.* at 318.  The Court left it to the individual states to develop a means of enforcing the restriction against the execution of mentally retarded offenders.  *Id.* at 317.  In response, the Mississippi Supreme Court set forth the standard for how *Atkins* is applied in trial courts in *Chase v. State*, 873 So.2d 1013, 1028-29

---

[18]  The American Association on Intellectual and Developmental Disabilities (formerly the American Association on Mental Retardation) currently uses the term "intellectual disability" instead of mental retardation.  For purposes of continuity and clarity in this opinion, the Court uses the term "mental retardation."

(Miss. 2004). Pursuant to the *Chase* standard, a determination of mental retardation is to be

made by the trial judge, by a preponderance of the evidence, after evidence is presented by both

the defendant and State. *Id.* The Mississippi Supreme Court held that:

> no defendant may be adjudged mentally retarded for purposes of the Eighth
> Amendment, unless such defendant produces, at a minimum, an expert who
> expresses an opinion, to a reasonable degree of certainty, that:
>
> 1. The defendant is mentally retarded, as that term is defined by the American
> Association on Mental Retardation and/or The American Psychiatric Association;
> 2. The defendant has completed the Minnesota Multi phasic Personality
> Inventory-II (MMPI-II) and/or other similar tests, and the defendant is not
> malingering.

*Id.* at 1029.

In *Chase*, the court also held that an offender may receive an evidentiary hearing on his claim of

mental retardation by presenting the court with an expert affidavit opining that the defendant has

a combined Intelligence Quotient (IQ) score of 75 or below, and that the defendant will be found

to be mentally retarded upon further testing. *Id.* Persons whose trials were final pre-*Chase* may

obtain an evidentiary hearing by attaching the above-described affidavit to the application for

post-conviction relief. *Id.*

Although it did not define mental retardation, the Court in *Atkins* cited the definition of

The American Association on Mental Retardation (AAMR)[19] and the American Psychiatric

Association (APA). *See Atkins*, 536 U.S. at 309 n.3. The definition of the AAMR provides that:

---

[19] The AAMR is now the American Association on Intellectual and Developmental
Disabilities (AAIDD). The Court retains the use of "AAMR" throughout this opinion for
purposes of clarity.

> Mental retardation relates to substantial limitations in present functioning. It is characterized by significantly subaverage intellectual functioning, existing concurrently with related limitations in two or more of the following applicable adaptive skill areas: communication, self-care, home living, social skills, community use, self-direction, health and safety, functional academics, leisure, and work. Mental retardation manifests before age 18.

AAMR, *Mental Retardation: Definition, Classification, and Systems of Supports* 5 (9th ed. 1992) ("1992 *AAMR*").[20]

The APA states that:

> The essential feature of Mental Retardation is significantly subaverage general intellectual functioning (Criterion A) that is accompanied by significant limitations in adaptive functioning in at least two of the following skill areas: communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academics, work, leisure, health, and safety (Criterion B). The onset must occur before age 18 years (Criterion C).

The American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* 41 (4th ed. 2000) ("*DSM-IV-TR*").

On post-conviction review, Petitioner presented the Mississippi Supreme Court with the affidavit of licensed psychologist, Dr. Daniel H. Grant, who evaluated Petitioner and presents an opinion that Petitioner is mentally retarded and has a full-scale IQ of 68. (*See* Grant Aff., June 17, 2003). The Mississippi Supreme Court determined that the evidence presented was insufficient to establish a prima facie case that Petitioner suffers from mental retardation. *Wiley*

---

[20] In 2002, the AAMR revised its definition: "Mental retardation is a disability characterized by significant limitations both in intellectual functioning and in adaptive behavior as expressed in conceptual, social, and practical adaptive skills. This disability originates before age 18." The American Association on Mental Retardation, *Mental Retardation: Definition, Classification, and Systems of Supports* 8 (10th ed. 2002) ("2002 *AAMR*"). It also instructs that "significant limitations in adaptive behavior" are "performance that is at least two standard deviations below the mean of either (a) one of the following three types of adaptive behavior: conceptual, social, or practical, or (b) an overall score on a standardized measure of conceptual, social, and practical skills." *Id.* at 14. At the evidentiary hearing held by this Court, Dr. O'Brien testified that his diagnosis would be the same under either the 9th or 10th editions, as did Dr. Swanson. (Hr'g Tr. at 42, 100).

*IV*, 890 So.2d at 898.  In reaching its conclusion, the court reviewed the relevant evidence in the record, which included reports from psychologists, school records, and affidavits from friends and family members.  *Id.* at 896.  The court noted that Petitioner's school records show that he had a very poor attendance record before he dropped out in the eighth grade, and that the affidavits allege that he dropped out of school to work.  *See id.*  The court further noted:

> The affidavits of Wiley's friends and relatives assert that Wiley is a good husband, father, son and grandson, that he was a good, reliable worker with steady employment at various employers, that he performed household maintenance, repaired automobiles, babysat children, ran errands, supported his family and did numerous other things.  Wiley was also in the Army until injuring his leg and getting honorably discharged.  The State asserts that the affidavits do not allege or establish that Wiley is mentally retarded.  We agree.

*Id.* at 896-97.  The court noted that in his previous application for post-conviction relief, in which he alleged his counsel's deficient performance in failing to present adequate mitigating evidence, Petitioner did not include a claim that counsel failed to present evidence he was mentally retarded.  *Id.* at 897.  Additionally, the court recalled that it rejected in Petitioner's first post-conviction petition a claim that the trial court erred in failing to allow a diminished capacity jury instruction, as it found an insufficient basis for the instruction.  *Id.*  The court cited with approval the State's argument that:

> These reports, affidavits and testimonies do not paint the picture of a retarded person. Simply because retarded people do not operate heavy machinery, retarded people do not drive tractors, retarded people do not hold jobs for much longer than a year at a time, much less work two jobs at a time, retarded people are not admitted to the radio operator school of the Army, retarded people do not get drivers licenses, buy cars and drive cars. Further, retarded people do not support families and see to it that all the bills are paid, retarded people do not see to the care of others and make sure they have enough money, a nice house, and school clothes.

*Id.* at 897.

The court stated "[w]e now find it necessary to expand on the procedure to be used in reaching a determination of mental retardation by holding that this Court will consider the entire record before it in deciding whether to grant an *Atkins* hearing." *Id.* at 897. Citing *Chase*, the court reiterated that before he may be adjudged mentally retarded, a defendant must submit an expert opinion stating so and have completed a test for malingering, but it noted that the satisfaction of those requirements does not automatically render an adjudication that the defendant is mentally retarded. *Id.* The court found that Petitioner had failed to demonstrate he had completed a test to show he was not malingering, and that the record disputes an assertion that his adaptive functioning is significantly limited. *Id.* at 897-98. The court further found that the school records submitted with the application were insufficient to establish mental retardation prior to age 18 and that the "overwhelming weight of the evidence" establishes he was not mentally retarded prior to the age of 18. *Id.* Rather, the court found that Petitioner "was a normal, productive citizen, who was never characterized as being 'mentally retarded' until such time as being mentally retarded became critically important in the realm of post-conviction relief." *Id.* The Mississippi Supreme Court denied Petitioner an evidentiary hearing on his *Atkins* claim and found he was not mentally retarded. *Id.* at 897-98.

Petitioner's subsequent motion for rehearing was denied on October 28, 2004. (*See* Post-Conviction Pleadings vol. No. 2003-DR-1317). In support of the motion for rehearing, Dr. Grant filed a supplemental affidavit addressing the lack of a malingering measure in the evidence submitted to the Mississippi Supreme Court. In the affidavit, Dr. Grant opines that the consistency of Petitioner's scores across tests measuring the same domains assures the accuracy and validity of the test results and precludes a probability of malingering. (Grant Supp. Aff. ¶¶ 6-

7, September 8, 2004). Dr. Grant also states that the MMPI-II requires a seventh-grade reading comprehension level, which is well-above Petitioner's reading comprehension skills, thereby preventing his completion of the test. (Grant Supp. Aff. ¶ 6).

In federal court, Petitioner argues that the affidavits from Dr. Grant meet the threshold requirement for obtaining an evidentiary hearing on his *Atkins* claim, and that the Mississippi Supreme Court failed to abide by its own case law and the directives of *Atkins* by denying him a hearing. (Pet. Memo 63). Petitioner argues that the Mississippi Supreme Court's reliance upon the affidavits of Petitioner's friends and relatives to determine that Petitioner is not mentally retarded is contrary to the recognized view that mentally retarded persons are often capable of performing "basic life activities." (Reply 7). Petitioner contends that evidence of his limited mental capacity was presented at his 1995 sentencing hearing through the testimony of Dr. Billy Fox and Dr. Gary Mooers, and that his IQ was argued at trial as a mitigating circumstance. (Reply 8).

Respondents assert Petitioner has failed to comply with Mississippi's requirements for asserting an *Atkins* claim. (R. Memo 164). First, Respondents argue Petitioner does not suffer from limitations in adaptive functioning. Respondents point out that neither Dr. Grant's affidavit nor his supplemental affidavit address the affidavits from Petitioner's friends and family members that speak to Petitioner's high level of adaptive functioning. (R. Memo 165-67). Respondents cite at length the affidavits in support of their argument. These affidavits, from Petitioner's sister, grandmother, mother-in-law, aunt, ex-wife, and several of his long-time friends, assert that Petitioner frequently provided money to help pay household bills, possessed skill repairing vehicles, provided transportation for others, volunteered for military service, and was a hard,

reliable worker who quit school to work to help provide for his family.  (*See* Ex. C-N, Post Conviction Pleading vol. No. 2003-DR-1317).

Respondents also assert that Dr. Billy Fox, who evaluated Petitioner in 1987 and 1994, provided the court with two affidavits that address Petitioner's intellectual functioning and discount Petitioner's allegation that he suffers from significantly subaverage intellectual functioning.  Dr Fox's first affidavit stems from his March 27, 1987, examination of Petitioner, and it contains a recitation of the mitigating evidence Dr. Fox would have offered had he testified at Petitioner's trial.  (Fox Aff., April 14, 1987).[21]  According to the 1987 affidavit, Petitioner obtained a full-scale IQ score of 73 as a result of the 1987 testing.  (Fox. Aff ¶7(a)).  Petitioner obtained a score of 78 on the WAIS-R in 1994.  (Fox. Supp. Aff. ¶ 5, June 16, 2003).  In the supplemental affidavit he swore in 2003, Dr. Fox stated that all of Petitioner's IQ scores, which carry a three to four-point margin of error, are consistent when the Flynn effect, a statistical phenomenon whereby standardized IQ scores on a given instrument increase as the test ages, is taken into consideration.  (Fox  Supp. Aff. ¶13).  Respondents assert that Flynn effect has been widely known and debated in the psychological community since it was first published in 1984. Respondents argue that if it were valid as applied to Petitioner, it would have been taken into account by Dr. Fox in his 1995 testimony.  (R. Memo 179).  Respondents state that in 1995, Dr. Fox stated the 1987 and 1994 testings were a reliable measure of intelligence.  (*See* Trial Tr. vol.

---

[21] Dr. Fox notes that he administered the MMPI during the examination, though he does not offer an opinion as to whether Petitioner was malingering.  (Fox. Aff. ¶ 5).  Dr. Fox's 1994 report states that Petitioner's cooperativeness, attention to task completion, and general demeanor suggested that "the results obtained from this evaluation do realistically represent his current behavioral functioning levels."  (Dr. Fox "Psychological Evaluation" at 2, August 22, 1994).

6, 543).  Moreover, Respondents argue, Dr. Fox did not address the issue of adaptive functioning in either his 1987 or 1994 reports.  (R. Memo 179-80).  Respondents also cite the report of Dr. Gary Mooers, who performed mitigation services for Petitioner and testified at his resentencing trial, for Dr. Mooer's information regarding Petitioner's adaptive abilities.  Specifically, Respondents cite that Dr. Mooers provided information that Petitioner (1) was trained as a radio man in the Army; (2) worked on construction as a heavy equipment operator; (3) was a skilled amateur mechanic and carpenter; (4) is trusted to be a "hall man" on death row; (5) studies the Bible and "consistently scores in the superior range in tests at the conclusion of each lesson"; (6) reads and writes a great deal; (7) exhibited a strong work ethic before imprisoned; and (8) is the "unofficial chaplain" for death row.   (Mooers Rpt., Ex. P to R. Memo; and Trial Tr. vol. 6, 523-36).

    After initially denying relief on Petitioner's claim in an opinion that has since been withdrawn, this Court ordered briefing and scheduled an evidentiary hearing on Petitioner's claim.  The Court held the evidentiary hearing on June 17, 2009, and the parties submitted post-hearing briefs on the issue of the deference this Court owes to the decision of the Mississippi Supreme Court.  As Petitioner's *Atkins* claim was rejected on the merits, and as there is no clearly established procedure by which states are to appropriately restrict death sentences pursuant to *Atkins*, the initial questions before this Court are whether the Mississippi Supreme Court (1) made a decision that was contrary to, or involved an unreasonable application of, clearly established federal precedent; or (2) made an unreasonable determination of facts in light of the evidence Petitioner presented.  *See* 28 U.S.C. § 2254(d)(1) & (2).  For the reasons that follow, the Court finds that it did.

The first time Petitioner was assessed for mental retardation was in 2003, when Dr. Daniel H. Grant conducted an evaluation. (Grant Aff. ¶12). Dr. Grant administered to Petitioner the Wechsler Adult Intelligence Scale - III ("WAIS-III"), and Petitioner obtained a full-scale IQ score of 68.[22] In 1987, Petitioner obtained a full-scale IQ score of 73 on the WAIS-R, and he obtained a ful-scale IQ score of 78 on the same test in 1994. Dr. Billy R. Fox reviewed Dr. Grant's test findings and determined that Petitioner's performance on the WAIS-III was consistent with Petitioner's performance on the earlier version of the same test he had administered to Petitioner in 1987 and 1994. (Fox. Aff. ¶¶ 3-8, June 16, 2003). In 1997, the WAIS-III replaced the WAIS-R, which had been in use since 1981. (*See* Pet Memo 59-60 n. 19). Dr. Fox considered the 1987 and 1994 scores consistent with Petitioner's performance on the 2003 test, in part, due to inflation of scores as the test ages, also known as the "Flynn effect." Intelligence tests are periodically revised - or the test is "normalized" - to address a gain in IQ points as the test ages. Dr. Grant and Dr. Fox opine, therefore, that if the scores on the outdated WAIS-R are normalized, Petitioner's true performance would be in the 71 to 73 range, consistent with the findings on the 2003 test. (Grant Aff. ¶ 16; Fox Aff. ¶¶ 3- 8).

Dr. Grant also administered several tests to assess Petitioner's adaptive functioning skills. (Grant Aff. ¶¶ 18-22). Dr. Grant's testing results indicate Petitioner's communication skills are in the 3rd percentile (Grant Aff. ¶ 18). Testing in mathematics, word recognition, spelling, and reading comprehension yielded scores with grade equivalents in the 4th to 5th grade ranges. (Grant Aff. ¶ 19). Additional testing yielded scores in less than the 1st percentile on the acquisition and

---

[22] Petitioner's scores from the 2003 testing yielded a Verbal IQ of 73, a Performance IQ of 68, which were combined for the full-scale IQ score, according to Dr. Grant's affidavit.

recall of information, which Dr. Grant opines to be "significantly impaired," even in light of Petitioner's intellectual limitations. (Grant Aff. ¶ 20). Petitioner scored in the 1st percentile on the health and safety subtest administered by Dr. Grant. (Grant Aff. ¶ 21). Dr. Grant also found Petitioner's overall performance on the Independent Living Scale illustrates "an ability to learn and perform simple tasks, but with significantly impaired reasoning and problem solving skills." (Grant Aff. ¶ 22). He also opines that Petitioner exhibits deficits in the area of money concepts, which is a category of adaptive skills recognized by the edition of The American Association on Mental Retardation's manual released in 2002. (*See id.* at ¶¶ 22-23; *see also* 2002 *AAMR)*.

Finally, Dr. Grant determines that Petitioner's school records support a determination that Petitioner's mental retardation manifested prior to the age of 18. (*See id.* at ¶ 30). Dr. Grant concludes that Petitioner "meets the clinical criteria for mental retardation as set forth in the *Atkins* decision." (*See id.* at ¶ 31). At the time of Petitioner's State court proceedings on his *Atkins* claim, Dr. Grant's findings, namely, that he has significantly subaverage intellectual functioning and deficits in at least two adaptive skills areas that were present by the age of 18, represent the only opinion in the record from a mental health professional as to whether Petitioner meets the definition of mental retardation.

The Supreme Court of the United States has held that states must provide a full and fair hearing to prisoners who claim they may not be executed because they are insane. *Ford v. Wainwright*, 477 U.S. 399 (1986). In *Panetti v. Quarterman*, 551 U.S. 930 (2007), the United States Supreme Court held that when a state fails to provide a full and fair competency hearing, it unreasonably applies the *Ford* rule and the federal court is not limited by the restrictions in 28 U.S.C. § 2254(d) on habeas review. The Fifth Circuit has read the decision in *Panetti* to require

that where a petitioner makes a prima facie showing of mental retardation in state court, the

state's failure to provide him with the due process opportunity to develop his claim deprives the

decision of deference normally due under 28 U.S.C. § 2254(d). *Rivera v. Quarterman*, 505 F.3d

349, 358 (5th Cir. 2007). In the post-conviction opinion handed down by the Mississippi Supreme

Court that disposed of this claim, then Presiding Justice Cobb voiced her agreement that it was

appropriate to consider the entire record and, in some cases, resolve the issue of mental

retardation without remanding it to the trial court for an evidentiary hearing. *See Wiley*, 890

So.2d at 899 (Cobb, J., concurring in part and dissenting in part). However, Justice Cobb went on

to state:

> I write separately to note my disagreement with the majority's conclusion that,
> based on the record before us, the overwhelming weight of the evidence compels
> this Court to find that Wiley is not mentally retarded, thus conclusively denying
> his motion to vacate his death sentence. In essence, the majority abandons our
> carefully written standards and procedures set forth in *Chase v. State*, 873 So.2d
> 1013 (Miss. 2004) and goes too far in substituting the Court's evaluation of the
> evidence and determination that Wiley is not mentally retarded, for the evaluation
> and determination to the contrary by professional psychologists trained in
> psychological and mental retardation evaluation procedures.

*Id.*

This Court agrees. Petitioner presented the Mississippi Supreme Court with an expert opinion

that he meets the definition for mental retardation in accordance with the procedure as set forth in

*Chase*. Additionally, despite the discussion of malingering in the Mississippi Supreme Court's

post-conviction opinion in this matter, Mississippi law does not require evidence on malingering

as a predicate to obtaining a hearing on an *Atkins* claim. *See Chase*, 873 So.2d at 1029. This

Court does not dispute that the Mississippi Supreme Court can dispose of some claims of mental

retardation without remanding the case for an evidentiary hearing, but it cannot arbitrarily refuse

to apply its own directives and, in the process, threaten the enforcement of the constitutional

restriction against the execution of offenders with mental retardation. The adjudication of

Petitioner's claim by the Mississippi Supreme Court involved no hearing at which the credibility

of witnesses could be tested through adversarial means.[23] Instead, the court substituted its

judgment for that of trained clinicians and deprived Petitioner, without notice, of the ability to

fully develop the factual basis of his claim. Fundamentally required of due process "is the

opportunity to be heard 'at a meaningful time and in a meaningful manner.'" *Fahle v. Cornyn*,

231 F.3d 193, 196 (5th Cir. 2000) (citations omitted). The Court is persuaded that Petitioner was

denied the minimum due process required to ensure that the constitutional restriction against

executing those with mental retardation is enforced, and the decision of the Mississippi Supreme

Court is, therefore, unreasonable. The Court thus reviews Petitioner's claim without the

deference normally afforded under the 28 U.S.C. § 2254(d).

---

[23] The Mississippi Supreme Court cited Dr. Grant's credentials questioningly in Petitioner's case. Citing a partial dissent in another Mississippi Supreme Court case, the Court notes:

1. Dr. Grant is licensed as a psychologist by the State of Georgia, and is board certified as a neuropsychologist by the American Board of Professional Neuropsychology. He is also a board certified forensic examiner and a Fellow of the American College of Forensic Examiners.

2. Dr. Grant worked for almost fifteen years as a contract a consultant for the Diagnostic Unit of the Coastal Correctional Institution in Georgia, where he assessed approximately 2,500 inmates, the majority of which had IQ's below 80. He made recommendations regarding their adaptive skills.

3. Dr. Grant worked for five years as a school psychologist, where he assessed students for special education classes.

4. Dr. Grant worked over three years on contract with the Georgia Department of Juvenile Justice as a consultant, providing assessments of adaptability and treatment.

5. In addition to his graduate and post-graduate studies in psychology and neuro-psychology, Dr. Grant minored at the doctoral level in the sub-specialties of reading and mental retardation.

*Hughes v. State*, 892 So.2d 203, 219-20 (Miss. 2004) (Dickinson, J., concurring in part and dissenting in part)

Prior to this Court's June 17, 2009 hearing on Petitioner's claim, the Court requested that the parties confer and submit the names of experts, upon which they could mutually agree, to assist the Court. The parties complied, and Dr. C. Gerald O'Brien, a clinical and forensic psychologist who has been designated an expert in approximately eight *Atkins*-related cases, was appointed by the Court to evaluate Petitioner. Petitioner obtained the services of Dr. Victoria Swanson, a licensed psychologist, for purposes of a pre-hearing evaluation.[24] Respondents obtained the services of Dr. Gilbert S. Macvaugh, III, a clinical and forensic psychologist, to evaluate Petitioner.[25] Petitioner was evaluated by each of the experts, and the experts submitted their respective reports to the Court prior to the evidentiary hearing.

Both Dr. O'Brien and Dr. Swanson testified that Petitioner meets the *Atkins* criteria for mental retardation based on the definitions in the *DSM-IV-TR* and those of both the 1992 and 2002 *AAMR* editions. (*See* Hr'g Tr. at 27, 42; 148; Swanson Rpt. at 38). Dr. Macvaugh, however, has opined to a reasonable degree of certainty that Petitioner is not mentally retarded as

---

[24] Dr. Swanson retired as head of psychology at Southwest Developmental Center, an intermediate care facility for persons with mental retardation, in 2003. (Hr'g Tr. at 91). She is a contract psychologist with Louisiana's Office of Mental Retardation, where she provides diagnostic testing and sits on the committee that determines whether individuals are eligible for disability services in Louisiana. (Hr'g Tr. at 92). She also currently heads up psychological services for several developmental centers in Louisiana. (Hr'g Tr. at 92). The Court notes that it allowed Dr. Swanson's testimony over the objection of Respondents. (*See* Hr'g Tr. at 99).

[25] Dr. Macvaugh is employed full-time with the Forensic Services Unit at the Mississippi State Hospital in Whitfield, and he also maintains a private practice. (Hr'g Tr. at 222). Petitioner's case is the first he has taken privately. (Hr'g Tr. at 223). Dr. Macvaugh has authored and co-authored material relevant to mental retardation determinations in *Atkins*-related cases, and he also teaches seminars on the assessment of mental retardation in capital murder cases in the pre-doctoral internship program at the Mississippi State Hospital. (Hr'g Tr. at 225-26).

set forth in *Atkins* and *Chase*. (*See*, *e.g.*, Macvaugh Rpt. at 34; Hr'g Tr. at 253). To determine whether Petitioner is exempt from execution, the Court addresses each prong of the definition of mental retardation in turn.

### Significantly Sub-Average Intellectual Functioning

According to the *DSM-IV-TR*, a person's general intellectual functioning is obtained by an assessment on a standardized intelligence test. *See DSM-IV-TR* at 41. The *DSM-IV-TR* defines significantly subaverage intellectual functioning "as an IQ of about 70 or below (approximately 2 standard deviations below the mean)". *Id*. An IQ score actually represents a range of possible scores, so an examiner must consider the measurement of error in assessing the results, and the measurement of error varies depending upon the specific instrument used. *See id*. Therefore, an obtained score of 70 on a Wechsler intelligence test actually represents a range of possible scores between 65 and 75. *Id*. The range of possible scores is important, because an individual with an IQ above 70 who exhibits significant deficits in adaptive behavior may be diagnosed as mentally retarded, while a diagnosis of mental retardation in the individual would not be proper if significant deficits are not apparent. *See DSM-IV-TR* at 42. Due to the relationship between the intellectual functioning and adaptive behavior prongs, there is no fixed exclusionary point for the intellectual functioning prong of the diagnosis. *See*, *e.g.*, *Atkins*, 536 U.S. at 308 n.5 (noting score of 70-75 on WAIS-III is typical cut off for intellectual functioning prong of mental retardation). Mild mental retardation, one of the four categories of mental retardation, comprises 85 percent of the mentally retarded population and is usually used to describe someone with an IQ level of 50-55 to approximately 70. *See DSM-IV-TR* at 42-43.

Relevant to the determination of an individual's intellectual functioning is the confidence

interval in which the individual's obtained score lies. The "confidence interval" is based on the reported standard error of measurement for the testing instrument used, and it is a report of how confident one can be that the interval around the obtained IQ score contains the true IQ score. (Swanson Rpt. at 4). The experts in this case used a 95 percent confidence interval, which means that the statistical chances are only 5 in 100 that Petitioner's true score lies outside of the reported confidence interval on the administered test. (*See*, *e.g*., Hr'g Tr. at 36-37; Swanson Rpt. at 21-22). Dr. Swanson's report offers the opinion that when multiple measures of intelligence are given over a period of time, overlapping confidence intervals are suggestive of where the true score lies. (Swanson Rpt. at 4, 22). The overlap in confidence intervals is particularly helpful, Dr. Swanson reports, where there are "outlier" scores, i.e., those scores which are atypically high or low when considering the pattern of scores. (Swanson Rpt. at 4).

Counsel in this case have debated whether the Flynn effect is appropriately considered by this Court in assessing whether Petitioner meets the *Atkins* or *Chase* criteria for a diagnosis of mental retardation. As noted earlier, the Flynn effect is a statistical phenomenon by which IQ scores drift upwards as the norms upon which the test is based age. The AAMR advises that IQ scores should be adjusted for the Flynn effect, while publishers of the Wechsler series of tests do not recommend adjusting IQs to account for the phenomenon. (Swanson Rpt. at 5). All three experts who testified at the evidentiary hearing in this matter stated that the Flynn effect is generally accepted in the psychological community and must be taken into consideration in interpreting Petitioner's full-scale IQ. (*See* Hr'g Tr. at 32, 103-04, 268). However, a controversy about the Flynn effect exists in its application. Professionals in the field do not disagree that the phenomenon exists, but rather, there is professional disagreement regarding whether to adjust an

individual's score. Dr. Macvaugh noted, for example, that IQ evaluations for certain services like disability evaluations do not take the Flynn effect into account in determining eligibility. (Hr'g Tr. at 275-76). The State has argued that the Mississippi Supreme Court has never endorsed the Flynn effect and this Court should ignore it in determining whether Petitioner meets the first prong of the definition for mental retardation. As Respondents correctly argue, the Fifth Circuit has not to date held that the Flynn effect is scientifically valid. *See, e.g.*, *In re Mathis*, 483 F.3d 395, 398 n.1 (5th Cir. 2007). The Mississippi Supreme Court has never addressed its validity. Respondents urge the Court to refuse to allow the phenomenon's application on the basis that the State's highest court has been presented, but has failed to endorse, the Flynn effect.

All three experts who testified before the Court at the evidentiary hearing stated that the Flynn effect is accepted by the relevant professional community and must be taken into consideration in evaluating Petitioner's scores. As Dr. Swanson noted during her testimony, test obsolescence has always been a factor that must be considered by examiners; otherwise, professionals would still be using the first version of the Wechsler test. (Hr'g Tr. at 103-104). The Court finds that regardless of whether the "Flynn effect" is considered as a precise mathematical formula in this case, it will take into consideration the obsolescence of test norms in weighing the evidence concerning Petitioner's intellectual functioning.[26] Although the intellectual functioning prong of the diagnosis is not concerned with a definitive "score" but with

_____

[26] The Court reiterates that Petitioner's claim is not analyzed with the deference of § 2254 as a factor. The Court is not holding that the Flynn effect must be applied to properly assess an individual's IQ, and it is not holding that failing to apply it is unreasonable. The Court only finds here that it is faced with an unanimous opinion that test obsolescence must be considered as a factor in interpreting Petitioner's IQ scores, and that it is not inclined to disregard the expert testimony in this matter in the absence of controlling legal authority.

the examinee's performance in relationship to the mean, it is also recognizes that Mississippi law treats full-scale IQ scores of 76 or higher as above the cutoff range to meet the subaverage intellectual functioning prong of the definition. *See*, *e.g.*, *Chase v. State*, 873 So.2d at 1029.

Petitioner has been given a test to assess his general intellectual functioning at least five times between 1987 and 2009. Four of these examinations involved an administration of the Wechsler test (the "WAIS-R" and "WAIS-III"), while the last examination, administered by Dr. Macvaugh, utilized the Standford-Binet, Fifth Edition ("SB5"). WAIS scales include verbal IQ and performance IQ components, while the SB uses ten subtests that can be narrowed into nonverbal IQ and verbal IQ. (Macvaugh Rpt. at 30). With both tests, the verbal and performance/nonverbal scores are converted to a full-scale IQ. Both the WAIS and SB meet the "gold standard" measure for use in *Atkins*-related hearings. (Swanson Rpt. at 16).

Of the experts that testified at the evidentiary hearing, only Dr. Swanson did not administer an IQ test to Petitioner. Dr. Swanson testified that she did not administer an IQ test to Petitioner out of her concern that his score would be artificially inflated due to practice effects. (Hr'g Tr. at 102). However, Dr. Swanson did re-score the SB5 administered to Petitioner by Dr. Macvaugh, and she determined that errors in Dr. Macvaugh's scoring resulted in an inflated test score on the SB5. Dr. Macvaugh conceded one scoring error and changed the full-scale IQ to reflect that error, but he disagreed with the remainder of Dr. Swanson's scoring. The Court will not discount Dr. Macvaugh's scores and substitute them with those of Dr. Swanson in the absence of some proof that Dr. Macvaugh's scoring was objectively erroneous and not just the result of a difference in examiner judgment. Therefore, the Court will consider the score as reported by Dr. Macvaugh's testimony to be the full-scale IQ score Petitioner obtained on the SB5. The Court

has charted Petitioner's IQ testing results from 1987 through 2009.  The chart below shows (1) the testing date; (2) the examiner administering the test; (3) the test given; (4) the obtained full-scale IQ score; (5) the 95 percent confidence interval for the obtained score; and (5) the full-scale IQ score when the Flynn effect is applied.

| Date | Examiner | Test | FSIQ | CI (95%) | Flynn-Adjusted[27] |
|------|----------|------|------|----------|----------------|
| 1987 | Fox | WAIS-R | 73 | 68-78 | 70 |
| 1994 | Fox | WAIS-R | 78 | 73-83 | 73 |
| 2003 | Grant | WAIS-III | 68 | 65-73 | 65[28] |
| 2007 | O'Brien | WAIS-III | 70 | 67-75 | 66 |
| 2009 | Macvaugh | SB5 | 80[29] | 76-84 | 77[30] |

Aside from the Flynn effect, two other "effects" are relevant in weighing the issue of Petitioner's general intellectual functioning: (1) the tree stump effect; and (2) the practice effect.

---

[27]The WAIS-R norms were gathered in 1978, making them 9 years old when administered in 1987 for a Flynn effect of 3 points. (.33x9 = 2.97).  (Swanson Rpt. at 17).  The 1994 results are  interpreted with an effect of 5 points. (.33 x.16 = 5.28).  The WAIS-III norms were collected from 1995 through 1996 and were 8 years old in 2003 and 12 years old in 2007.  The 2003 scores have a Flynn effect of 3 points (.33x8 = 2.64), and an effect of 4 points (.33 x 12 = 3.96) for 2007.  (Swanson Rpt. at 17).

[28] The Court notes that Dr. O'Brien, in his report, indicates that he believes the 2003 Flynn-adjusted score should be 63 and the 2007 adjusted score 64.  (*See* O'Brien Rpt. at 3).

[29] This represents the score Dr. Macvaugh reported once the one correction was made, and it does not represent Dr. Swanson's assessment of what the properly scored test result should be.

[30]  This reflects a correction of 3 points for the Flynn effect, as the norms for the SB5 were collected in 2001 (*See* Swanson Rpt. at 20; Macvaugh Rpt. at 33).  If the Court were to use Dr. Swanson's corrected score, the Flynn-adjusted full-scale IQ score would be 73.  (*See* Swanson Rpt. at 20).

These effects are not accounted for in the numerical report of Petitioner's intellectual functioning, though they are both factors that Dr. Swanson and Dr. O'Brien noted are relevant to consider in a determination of a person's intellectual functioning. (Hr'g Tr. at 31; 39; 102; 106-07). The "tree stump effect" refers to a phenomenon whereby takers of the WAIS-III have been able to obtain an IQ score in the 40s without giving any correct responses as a result of skewing in the standardization group of the WAIS-III. (*See* Swanson Rpt. at 6; Hr'g Tr. at 31, 33).[31] Meanwhile, a "practice effect" is an inflated score as a result of the examinee having been exposed to multiple repetitions of the same or similar test. (*See*, *e.g.*, Hr'g Tr. at 32). The theory is that because IQ assessments rely upon novel tasks and instructions to assess ability and performance, an instruction given on a test will be more familiar to the examinee and more quickly implemented on subsequent presentations. Dr. Swanson states in her report that practice effects are normally greater on performance items than on verbal items, as the examinee may be able to recall the prior strategy needed to solve the task. (Swanson Rpt. at 5). Dr. Swanson states that since the 2007 administration of the WAIS-III was the fourth time Petitioner was exposed to four of the same performance subtests, it is expected that his performance IQ would drift upwards over the course of the test administrations. (Swanson Rpt. at 20). Below, the Court has listed Petitioner's verbal IQ and performance IQ scores for each of the four WAIS examinations.

|  1987 WAIS -R | 1994 WAIS -R | 2003 WAIS-III | 2007 WAIS-III |
|---|---|---|---|

---

[31] Experts have noted that when the WAIS-III was stratified, too many low score examinees were included, which causes the norms to overstate the IQ by 2.34 points. (Swanson Rpt. at 6). Therefore, results on a WAIS-III may be reduced by 2.34 points to account for the sampling error in this particular instrument. (Swanson Rpt. at 6). Dr. Swanson and Dr. O'Brien both noted the existence of this phenomenon, but neither downwardly adjusted Petitioner's score for its effect. (Hr'g Tr. at 33; Swanson Rpt. at 4).

| | | | | |
|---|---|---|---|---|
| Verbal IQ | 75 | 74 | 73 | 72 |
| Performance IQ | 72 | 83 | 68 | 73 |

Petitioner obtained a performance IQ score of 83 in 1994 the second time he took the WAIS-R. Dr. O'Brien testified at the evidentiary hearing that Petitioner's performance score on that examination is an "outlier," which Dr. Swanson also notes in her report. (Hr'g Tr. at 62; Swanson Rpt. at 21). Specifically, Dr. Swanson notes that Petitioner's performance score decreased from 1994 to 2003, and she opines that the decrease may be accounted for by the presence of novel performance items on the WAIS-III. (Swanson Rpt. at 21). The pattern of Petitioner's obtained scores on the WAIS tests indicate that Petitioner's performance IQ increased several points on the second administration of the WAIS-R and the WAIS-III, while his verbal scores have remained fairly consistent across the examinations.[32]

All of the experts were able to review the previous reports and test data of Dr. Grant in reaching their respective conclusions. Dr. Fox's records and test data, however, have since been destroyed. Since no raw test data was available for review from Dr. Fox, Dr. O'Brien reported more confidence in Dr. Grant's reported scores. (O'Brien Rpt. at 3). However, Dr. O'Brien opines that Petitioner's scores on various instruments between 1987 and 2007 are "generally quite consistent" when the Flynn effect is taken into consideration. (O'Brien Rpt. at 5). He opines that even if Petitioner's IQ scores are not adjusted to account for the Flynn effect, Petitioner's full-scale IQ is likely to be in the 67-75 range. (O'Brien Rpt. at 5). He concludes that Dr. Macvaugh's scores are "outliers," in that they do not fit within the pattern of scores. (Hr'g Tr. at 40). Like Dr.

---

[32] The Court notes that Petitioner received a nonverbal score of 77 and a verbal score of 88 on the SB5.

O'Brien, Dr. Swanson believes the pattern of Petitioner's scores is "fairly tight" and fall into the confidence interval for a score of 70.[33]  (Hr'g Tr. at 112).  Over four administrations of the WAIS, the Flynn-adjusted results overlap between a full-scale IQ score of 68 and 70, which is where Dr. Swanson opines Petitioner's true score lies.  (Hr'g Tr. at 114).  Dr. Macvaugh, on the other hand, believes that Petitioner falls within the low average range of intellectual functioning.  (Macvaugh Rpt. at 30).  Dr. Macvaugh testified that he reviewed the testing data and disagreed with some of Dr. Grant and Dr. O'Brien's scores, but that his disagreement would have changed the subtest scores in a "mostly" negligible manner.  (Hr'g Tr. at 234).  Dr. Macvaugh testified that some examiners could, in good faith, reach the conclusion that Dr. Swanson reached when re-scoring the SB5.  (Hr'g Tr. at 266).  He disputed the notion, however, that IQ scores are stable over time, and stated that re-scoring Petitioner's SB5 to bring it "in line" with the other scores does not make the results more consistent than those he reported.  (Hr'g Tr. at 266-67).

In Mississippi, and IQ of 75 is the "cutoff score" for assessing subaverage intellectual functioning for purposes of diagnosing mental retardation.  *Chase*, 873 So.2d at 1028.  The record contains three expert assessments that explicitly find that Petitioner's full-scale IQ is below 75 without any adjustment for inflation, practice effects, or skewing.  The record also contains three qualified opinions that Petitioner suffers from significantly subaverage general intellectual functioning.  Additionally, Dr. Fox has submitted an affidavit opining that the scores Petitioner obtained on the 1987 and 1994 administrations of the WAIS-III are not inconsistent with his 2003 scores on the same instrument.  On direct examination at the sentencing trial, Dr. Fox testified that Petitioner's scores on the WAIS fell within "the borderline range"of mental retardation on both the

---

[33] The pattern Dr. Swanson testified to assumes the corrections she made in re-scoring the results of the SB5 administered by Dr. Macvaugh.

1994 and 1987 tests. (Trial Tr. vol. 6, 543, lines 4-5, 12-16). In his 2003 affidavit, Dr. Fox stated

that the scores obtained through Dr. Grant's evaluation are consistent with both the 1987 and 1994

scores when one accounts for test obsolescence, the practice effect, and the margin of error. (Fox

Aff. ¶¶ 8, 12, 13). It is also noteworthy that when Dr. Robert M. Ritter accompanied Dr. Fox to

the Mississippi State Penitentiary to conduct a neuropsychiatric evaluation of Petitioner in 1994,

Dr. Ritter's diagnostic impression at that time was that Petitioner suffers from marginal mental

retardation. ("Neuropsychiatric Evaluation," Dr. Ritter, at 13, 14). The Court notes that prior to

*Atkins*, mental health professionals were not assessing Petitioner to determine whether he met the

diagnosis for mental retardation. The notations of Petitioner's marginal intellectual functioning in

these early reports lends credibility to subsequent findings that Petitioner's intellectual functioning

is significantly subaverage.

Based upon the pattern of Petitioner's full-scale scores and his performance IQ and verbal

IQ scores across multiple administrations of Wechsler examinations, the Court determines that

Petitioner has demonstrated that he suffers from significantly subaverage intellectual functioning.

Petitioner's scores on the SB5 are not consistent with the other reported scores, and Dr. Macvaugh

conceded at the evidentiary hearing that his disagreement with Dr. Grant and Dr. O'Brien's

scoring is largely based upon examiner judgment rather than error in scoring. (Hr'g Tr. at 234-35).

The Court also notes that once all of Petitioner's IQ scores on the WAIS are adjusted for test

obsolescence, the confidence interval for each of those tests results overlaps at 68 to 70, as noted

in Dr. Swanson's report and testimony. (*See*, *e.g.*, Swanson Rpt. at 22). Even if test obsolescence

is not considered, the record still contains sufficient evidence that Petitioner's general intellectual

functioning is significantly limited.[34]  This Court determines that Petitioner has demonstrated by a preponderance of the evidence that he suffers from significantly subaverage intellectual functioning.

### *Adaptive Functioning*

A diagnosis of mental retardation requires significantly subaverage general intellectual functioning "that is accompanied by significant limitations in adaptive functioning in at least two [] skill areas." *DSM-IV-TR* at 41.  The definitions of the *DSM-IV-TR* and the 1992 *AAMR* use the same categories of skill areas to be considered.[35]  These adaptive skill areas are (1) communication; (2) self-care; (3) home living; (4) social skills; (5) community use; (6) self-direction; (7) health; (8) safety; (9) functional academics; (10) leisure; and (11) work.  *See*, *e.g.*, *DSM-IV-TR* at 41; 1992 *AAMR* at 5.  Statistically, "significant limitations in adaptive behavior" is a "performance that is at least two standard deviations below the mean" in one of the adaptive behavior skill areas.  *See* 2002 *AAMR* at 8, 14.

Persons with mild mental retardation can develop social, communication, and minimal sensorimotor skills in at an early age such that they are not distinguished from normally

---

[34] Though not conclusive to the issue, the Court notes that the average of Petitioner's full-scale IQ scores from 1987 through 2009, without adjustment, is 73.8, which is still within the range of possible scores for a diagnosis of mild mental retardation.

[35] The 1992 *AAMR* combines "health and safety" into one category while the *DSM-IV-TR* separates them into two categories.  As such, the *AAMR* uses ten categories while the *DSM-IV-TR* references eleven.  In 2002, the *AAMR* re-designated the skill areas into three categories: conceptual, social, and practical.  2002 *AAMR* 73.  The re-designated categories of skill areas are essentially a "collapsed" version of the ten skills noted in the 1992 edition.  (Swanson Rpt. at 2).  A clinician making a diagnosis using the 2002 edition determines whether the individual scores two standard deviations or more below the mean in one of the three adaptive behavior skill areas to determine if that individual's limitation is significant.  *See* 2002 *AAMR* at 78.

functioning individuals until later in life.  Harold L. Kaplan & Benjamin J. Saddock, *Synopsis of Psychiatry: Behavioral Sciences/Clinical Psychiatry* 1138 (8th ed. 1998).  During their school years, persons with mental retardation can learn academic skills up to the sixth-grade level, approximately, and by their late teens and may be "guided toward social conformity."  *Id.*  As an adult, they can "usually achieve social and vocational skills adequate to minimum self-support but may need guidance and assistance when under unusual social or economic stress."  *Id.*  The impairment, in the case of mild mental retardation, is frequently not apparent.  (Hr'g Tr. at 48, 100).  In rejecting stereotypical notions that a person with mental retardation necessarily has obvious physical characteristics or speech impairment, Dr. O'Brien noted at the evidentiary hearing that Petitioner "comes across fairly well" when interviewed.  (Hr'g Tr. at 47-48).

 The APA characterizes a person's adaptive functioning as "how effectively individuals cope with common life demands and how well they meet the standards of personal independence expected of someone in their particular age group, sociocultural background, and community setting."  *DSM-IV-TR* at 42.  Similarly, the AAMR advises that examiners should consider "community environments typical of the individual's peers and culture" in considering an individual's adaptive functioning.  2002 *AAMR* at 93.  The *DSM-IV-TR* notes that it useful when assessing adaptive functioning for the examiner to gather evidence

> from one or more reliable independent sources (e.g., teacher evaluation and educational, developmental, and medical history). Several scales have also been designed to measure adaptive functioning or behavior (e.g., Vineland Adaptive Behavior Scales and the American Association on Mental Retardation Adaptive Scale.  These scales generally provide a clinical cutoff score that is a composite of performance in a number of adaptive skill domains.

 *DSM-IV-TR* at 42.  As many people with mild mental retardation are frequently capable of some

self-support, they are distinguished, in part, by the level of support they require to do something well and how quickly supports can be withdrawn to allow the individual to function independently. (*See*, *e.g.*, Hr'g Tr. at 120-21). A person who performs a task well with support may cease to function if supports are removed too suddenly. (Hr'g Tr. at 120-21; 277).

Two examiners have used standardized adaptive measures to help them assess Petitioner's adaptive functioning. First, Dr. Grant administered the Independent Living Scale in 2003. More recently, Dr. Swanson used the Vineland-II Adaptive Behavior Scales (VABS-II) ("Vineland") and the Adaptive Behavior Assessment Scale, Second Edition (ABAS-II), which she states meet the "gold standard" of standardized adaptive functioning assessments in the field. (Swanson Rpt. at 27; Hr'g Tr. at 127-28). The measures administered by Dr. Swanson are retrospective, which means that they are designed to currently assess an individual based upon what the person was like in the past. (Hr'g Tr. at 132-33).

JoAnn Butler, Petitioner's grandmother, was administered one of the standardized adaptive measures. Mrs. Butler answered questions about Petitioner's abilities when he was age 15, because that is a time she vividly remembers his abilities and activities. (Hr'g Tr. at 132-33; 173). At the time of the interview with Dr. Swanson, Mrs. Butler was in poor health at the age of 95 and was living in a nursing home. Mrs. Butler was given the ABAS-II in a semi-structured interview form, and Dr. Swanson states she chose this particular instrument to use with Mrs. Butler because the subscale areas of communication, functional academics, self-direction, and community use can be used independently when a total score cannot be obtained. (Swanson Rpt. at 28, 32). The ABAS-II provides an overall assessment of functioning in the form of a generalized adaptive composite (GAC), and it provides domain scores in areas of conceptual,

social, and practical skills. (Swanson Rpt. at 27-28)).

The VABS-II, or Vineland, was administered to Diane Wiley, who answered questions about Petitioner when he was 18 years old. (Hr'g Tr. at 137). Petitioner met Mrs. Wiley when he was 17 and she was 14, and he moved into her family's home in Memphis after he was "put off" the Darling property for missing chores. (Swanson Rpt. at 10). Petitioner and Mrs. Wiley married in 1973 and subsequently had two children, one of which has been diagnosed with mental retardation. (Swanson Rpt. at 10). The Vineland measures habitual performance in day-to-day activities and not a person's capacity for an activity. It yields an Adaptive Behavior Composite that is made up of the categories of communication, daily living, socialization, and motor skills. (Hr'g Tr. at 136). This test provides an overall score with a mean of 100 and a standard deviation of 15. (Hr'g Tr. at 137).

Standardized instruments assessing adaptive behavior typically involve interviews with third-party informants who rate an individual's actual behavior at a time the informant can clearly remember the individual's abilities. The age chosen for Mrs. Butler and Mrs. Wiley to consider Petitioner's habitual activities was based upon their report of when their memories of Petitioner were vivid. (*See*, *e.g.*, Hr'g Tr. at 172-73). Petitioner was born to a mentally ill, alcoholic mother, and he went to live with his maternal grandparents on a farm they sharecropped for the landowner. (Swanson Rpt. at 9). After his grandfather died when Petitioner was approximately 15 years old, he quit school to help his grandmother on the farm. (Swanson Rpt. at 9). After he and his grandmother were unable to maintain the farm, they moved to the property of Carl P. Darling to work. (Swanson Rpt. at 9). He lived there until he moved to Memphis to live with his future wife, Diane, and her family. Petitioner's grandmother and wife were, at the time of the relevant

evaluations, the living individuals best suited to answer questions about Petitioner's adaptive functioning prior to age 18.

Clinicians debate whether retrospective assessments are valid for the purpose of assessing a person's adaptive functioning in an *Atkins*-related context. For example, there may be concern that the informant's memory is poor, or that the informant's intent is to help a loved one avoid execution at the expense of historical accuracy. Dr. O'Brien states in his report that he did not administer any adaptive behavior tests to Petitioner, due to the problems with administering them. (Hr'g Tr. at 65). At the evidentiary hearing however, he stated that he would now consider using a standardized adaptive measurement, as the scales have been improved and more research has been conducted into how to assess mental retardation using them. (Hr'g Tr. at 67). Dr. Macvaugh does not support the use of standardized adaptive measurements in an *Atkins*-related inquiry, as the instruments have not been standardized with incarcerated offenders who have been in relative isolation for a number of years. (*See* Macvaugh Rpt. at 17). The Court notes that standardized measures are not normed for a prison population, and what a person can do in a structured environment is not indicative of how the individual will perform in the open community. Dr. Macvaugh testified that people with mental retardation show less impairment with more structure, and both Dr. Macvaugh and Dr. O'Brien note that the years Petitioner has spent incarcerated may have allowed him to improve in some of the areas of adaptive functioning. (Hr'g Tr. at 277-78; O'Brien Rpt. at 6).

Both Dr. O'Brien and Dr. Swanson note that the Vineland and the ABAS-II are widely recognized and accepted in the psychological testing community for assessing adaptive behavior, and the Court notes that the 2002 *AAMR* requires the use of a standardized adaptive instrument in

assessing adaptive skills. (*See* Hr'g Tr. at 68, 134). A resource document approved by the APA Council on Psychiatry and Law in May 2003 also urges states to enact laws that "encourage the use of at least one standardized measure of adaptive behavior while recognizing the ultimate need for clinical judgment." The American Psychiatric Association's Resource Document on Mental Retardation and Capital Sentencing: Implementing *Atkins v. Virginia*, *The Journal of the American Academy of Psychiatry and the Law*, 32:304-8, 2004. At the evidentiary hearing, Dr. Macvaugh conceded that some experts advocate the use of standardized measures to guide the examiner's ultimate opinion, because there are no other alternatives at times. (Hr'g Tr. at 239-41). Also at the evidentiary hearing, Dr. Swanson defended the use of the instruments by her testimony that the authors of the Vineland recommend using a retrospective analysis when the person whose functioning at issue is in a restrictive environment, such as prison, for an extended period of time. (*See* Hr'g Tr. at 135-36).

Even though Petitioner's adaptive functioning has only been assessed with the aid of standardized measures of adaptive functioning on two known occassions, Petitioner's adaptive functioning skills have been assessed four known times. The assessments were conducted by: (1) Dr. Grant in 2003; (2) Dr. O'Brien in 2008; (3) Dr. Macvaugh in 2008-2009; and (4) Dr. Swanson in 2009. All four experts agree that Petitioner demonstrates significant deficits in the adaptive skill area of functional academics. Dr. O'Brien and Dr. Swanson agree that, before he reached age 18, Petitioner exhibited significant deficits in the areas of (1) communication; (2) functional academics; (3) social/interpersonal; and (4) self-direction. (O'Brien Rpt. at 6; Swanson Rpt. at 38). The chart below indicates by the notation of "x" the areas of significantly limited adaptive functioning found by each examiner in the adaptive functioning areas designated by the APA.

|  | Grant | O'Brien[36] | Swanson[37] | Macvaugh |
|---|---|---|---|---|
| Communication | x | x | x | |
| Self-care | | | x | |
| Home living | | | x | |
| Social/interpersonal | | x | | |
| Community use | | | x | |
| Self-direction | | x | x | |
| Health | x | x | x | |
| Safety | x | x | x | |
| Functional academics | x | x | x | x |
| Leisure | | x | x | |
| Work | | x | | |

The Court notes that the *DSM-IV-TR* and the *AAMR*, in their diagnostic criteria, refer to deficits in adaptive skills without respect to strengths. Whether a person exhibits strengths in a particular adaptive skill area is irrelevant to whether the individual suffers from a deficit in another skill area. *See*, *e.g.*, 2002 *AAMR* at 8 (noting that "limitations often coexist with strengths" within

---

[36] Dr. O'Brien opines that Petitioner's deficits in communication; social/interpersonal skills; self-direction; functional academic skills; and work were manifested by age 18 supported by the information available. (O'Brien Rpt. at 6). Dr. O'Brien opines that Petitioner has "four possible areas of current deficiency." (O'Brien Rpt. at 6).

[37] Dr. Swanson opines that Petitioner currently suffers from deficits in communication, functional academic skills, and self-direction from the information obtained from multiple sources. (Swanson Rpt. at 39).

an individual).  However, the Fifth Circuit has held that a person's strengths in a particular domain is relevant to whether the individual has significant limitations in that particular area.  *See Clark v. Quarterman*, 457 F.3d 441, 447 (5th Cir. 2006).  Most of the information relevant to Petitioner's adaptive functioning levels prior to *Atkins* comes from the affidavits of Petitioner's friends and family members filed during the pendency of Petitioner's State court proceedings.  The Court's discussion below references the information contained in the affidavits without citing directly to them, but this Court and each professional who has evaluated Petitioner in the course of these proceedings has considered the information contained within the affidavits.  Many of the facts recounted in the discussion of Petitioner's adaptive functioning necessarily relate to more than one diagnostic skill area, but the Court has attempted to compartmentalize some of the information.

Standardized Adaptive Assessments - Dr. Swanson

As noted previously, Dr. Swanson administered the VABS-II (Vineland) to Mrs. Wiley, Petitioner's estranged wife, and the ABAS-II to Mrs. Butler, Petitioner's grandmother, for the purpose of assessing what Petitioner's adaptive functioning skills were like prior to adulthood. Petitioner's composite score on the VABS-II as reported by Mrs. Wiley was a 67, which is two standard deviations below the mean.  (Hr'g Tr. at 137).  Though he was at the mean in motor skills, Petitioner scored two standard deviations below the mean in socialization, daily living, and communication at the age of 18. (Swanson Rpt. at 28).  Specifically, Dr. Swanson opines that the VABS-II scores indicate Petitioner's substantial limitations prior to age 18 in the *DSM-IV-TR* adaptive functioning areas of (1) communication; (2) functional academic skills; (3) self-care; (4) home living; (5) community use; (6) leisure; and (7) self-direction.  (Swanson Rpt. at 29-30).   Dr. Swanson states in her report that Petitioner's limitation in each of the identified areas is supported

88

by collateral information. (Swanson Rpt. at 29-30). The ABAS-II results from the assessment with Mrs. Butler yielded scores two standard deviations below the mean in communication (-2.00), functional academics (-2.00), and self-direction (-2.33). (*See* Swanson Rpt. at 32). The Court notes that these three areas also make up the conceptual composite that is one of the three categories of adaptive skills used in the 2002 *AAMR* definition for adaptive behavior.

Dr. Swanson opines that the Vineland and ABAS-II scores indicate Petitioner met the 2002 *AAMR* criteria and the *DSM-IV-TR* adaptive criteria before the age of 18, and that evidence from multiple sources indicates that Petitioner continues to have significant deficits in the *DSM-IV-TR* adaptive skills areas of communication, functional academics, and self-direction. (Swanson Rpt. at 38). Though the results of standardized assessments informed Dr. Swanson's ultimate opinion as to Petitioner's adaptive functioning, Dr. Swanson's report indicates that she used multiple informants and direct probes to cross-reference information and validate the information gathered in the standardized assessments. (Swanson Rpt. at 27).

Functional academic skills

Dr. Grant and all three experts who evaluated Petitioner as part of his federal habeas case agree that Petitioner has significant limitations in the area of functional academics. (Hr'g Tr. at 41; Macvaugh Rpt. at 33; Swanson Rpt. at 34-35). While Petitioner's school records do not reflect that any standardized academic testing was administered to Petitioner during his school years, Petitioner's academic skills have been tested on at least five occasions since his incarceration. Dr. Grant administered the WRAT-III to Petitioner in 2003, and Dr. Grant states in his affidavit that Petitioner functions at a 4th grade level. (Grant Aff. ¶ 19). Dr. O'Brien administered to Petitioner the Wide Range Achievement Test - Fourth Edition (WRAT-4) to test Petitioner's basic academic

skills.  (*See* O'Brien Rpt. at 2-3).  The results of that testing demonstrate that Petitioner functions academically between 3rd and 6th grade levels.  (Hr'g Tr. at 46-47).  Dr. Macvaugh also administered the WRAT-4 to Petitioner, and Petitioner obtained scores in various basic academic skills at the 4th through 6th grade range.  (*See* Macvaugh Rpt. at 15).

Dr. Swanson testified that she administered the Woodcock Johnson, Third Edition (WJ-III) to assess Petitioner's academic and communication skills.  (Hr'g Tr. at 122).  She testified that Petitioner scored between the 3rd and 6th grade range, which is typical for persons with mild mental retardation.  (Hr'g Tr. at 122).  Dr. Swanson also reports that the obtained results on the WJ-III are consistent with Petitioner's previous assessments from 1987 through 2009.  (Swanson Rpt. at 35).  Aside from the standardized testing, Dr. Swanson conducted "academic probes" with Petitioner to validate the testing results.  (Swanson Rpt. at 35).  Dr. Swanson found that these probes revealed that Petitioner possesses some basic reading and mathematical skills, but that the probes validate that his functional academic skills are greater than two standard deviations below the mean.  (Swanson Rpt. at 35).  As part of her assessment of Petitioner, she also conducted with him a mental status exam.  She reports that Petitioner required two minutes to print six words out of a nine word sentence; that he could not perform abstract verbal problems and struggled with abstract reasoning; that he had difficulty with basic differences (i.e., fruit/vegetable) but performed better with simple similarities (i.e., milk/water); that he could not interpret proverbs; and that he read basic words but had no memory of what he had read.  (Swanson Rpt. at 26-27).  In addition to the academic testing, Petitioner's subdomain score in "Written Language" on the VABS-II was 2.00 standard deviations below the mean, indicating that he has substantial limitations in this area. (*See* Swanson Rpt. at 29-30).

A conclusion as to Petitioner's functional academic skills is also informed by looking to the evidence available during the course of State court proceedings. Dr. Gary Mooers, a professor of social work, was retained by the defense at Petitioner's re-sentencing trial to provide mitigation testimony. (*See* Trial Tr. Vol. 6, 523-36). During the course of his investigation, he interviewed prison officials, family, and friends concerning Petitioner's background and life. (*See id.* at 525-26). Dr. Mooers testified at trial that he learned that Petitioner was a very hard, reliable worker, and that he had been an average student in school. (*See id.* at 527). He remarked that Petitioner was medically discharged from the military after his previously injured leg prevented him from serving. (*See id.* at 528). He also noted that Petitioner had devoted much of his time while imprisoned to religious studies and has numerous pen-pals. (*See id.* at 533). Both Dr. O'Brien and Dr. Swanson noted that they had reviewed Dr. Mooers' report, and it did not change their opinions that Petitioner meets the diagnosis for mental retardation. (Hr'g Tr. at 52-53; 141).

As noted by Dr. Swanson, Dr. Mooers' report does not appear to be consistent with the available school records. (*See id.* at 141). Petitioner failed the fifth and sixth grades before dropping out of school in the eighth grade. (Grant Aff., Attachment B). In the first grade, he received one C-, and the remainder of his grades were D's. (Grant Aff., Attachment B). While his best grades were achieved in the sixth grade, they were achieved when Petitioner repeated that grade. (Grant Aff., Attachment B). At trial, the records custodian of DeSoto County Schools produced the school records of Petitioner and testified that Petitioner's grades were "very marginal" throughout school. (*See* Trial Tr. Vol. 7, 623-24). The records also contain Petitioner's scores over the years on a "personal and social evaluation," where he received above-average scores every year in the category of "working well with others." (*See id.* at 625). He received low

and below average scores on "leadership" every year. (*Id.*).

In 1994, Dr. Billy Fox administered the WRAT-2 to Petitioner, and his evaluation states that Petitioner's scores "represent underachievement in all areas." (Dr. Billy R. Fox, "Psychological Evaluation", August 22, 1994, Ex. 16 to Pet. Memo) ("Fox Rpt"). Psychiatrist Dr. Robert Ritter evaluated Petitioner in 1994, and Dr. Ritter notes in his report of the neuropsychiatric evaluation that Petitioner keeps a bound notebook with names, addresses, telephone numbers, and information he needs to make a telephone call. (Dr. Robert Ritter, "Neuropsychiatric Evaulation" at 8-9, August 22, 1994) ("Ritter Rpt."). The report also indicates that Petitioner "had difficulty in making simple change, and he could not accurately subtract by sevens. He got cities confused with states, and he knew next to nothing on current affairs of significance." (Ritter Rpt. at 13). Dr. Swanson noted similar findings as result of her evaluation. Dr. Swanson noted in her testimony that the issue is not whether Petitioner can read, but rather, how many words he can read in a minute and whether he can understand the words he is reading. (*See id.* at 143-44). Dr. Swanson testified that she learned from her probes with him that Petitioner reads very slowly and with aids, like a dictionary, to help him. (Hr'g Tr. at 144). The Court notes that Petitioner answered a question about his present health on a military information sheet when he was 19 years old by responding "I am good helf." (Hr'g Tr. at 148).

Communication skills

Dr. Swanson testified at the evidentiary hearing that questions that relate to a person's communication skills refer to a person's ability to engage in conversation without someone else directing it, as well as the individual's ability to make conversation with an unfamiliar person or an unfamiliar topic. (Hr'g Tr. at 192-93). Like Dr. Grant, Dr. O'Brien and Dr. Swanson both agree

that Petitioner has significant limitations in the adaptive skill area of communication. Information relating to Petitioner's communication skills is found in Petitioner's oral comprehension scores on his academic tests, the language battery he completed in 2003, his available school records, interviews with Petitioner by the experts, reports from interviews with Petitioner's family and friends, and the observation of the experts who evaluated him.

In 2003, Dr. Grant administered to Petitioner the Oral and Written Language Scale (OWLS), which tests language skills, and the Expressive Vocablulary Test (EVT). (Grant Aff. ¶ 18). Petitioner's Oral Composite score on the OWLS was a 71, and his score on the EVT was 52. (Grant Aff. ¶ 18). Dr. Grant concluded that Petitioner's performance on these tests demonstrate that he has significant deficits in the area of communication skills. (Grant Aff. ¶ 18). Petitioner's subdomain scores in "Receptive," "Expressive," and "Written" Language on the VABS-II ranged between 1.67 and 2.0 standard deviations below the mean, and Dr. Swanson found this indicated that Petitioner has substantial impairments in the area of communication. (*See* Swanson Rpt. at 29-30). At the evidentiary hearing, Dr. Swanson testified that the age of 18, Petitioner's overall communication skills were that of someone 6 to 9 years of age. (*See* Hr'g Tr. at 138).

Numerous affidavits were filed on Petitioner's behalf during the course of his legal proceedings in State court, and Dr. Macvaugh notes that these affidavits do not indicate that Petitioner suffers from significant limitations in the adaptive area of communication skills. For instance, the affidavits repeatedly reference Petitioner's communication with his family and friends either by letter or telephone. (Macvaugh Rpt. at 17-21). In addition, Dr. Macvaugh notes that Petitioner has submitted numerous "sick call" forms, which are forms upon which inmates request medicine and/or medical attention, during the course of his incarceration. (Macvaugh Rpt.

at 21).  These reports contain detailed references to Petitioner's particular physical complaint, and on most of his requests for medication refills, Petitioner indicates the particular medications and dosages needed.  (Macvaugh Rpt. at 21-23).  Dr. Macvaugh stated at the evidentiary hearing that the medical request forms show Petitioner can express himself and request help in written format.  (Hr'g Tr. at 249).  Dr. Macvaugh also notes that during the course of his interviews with Petitioner, Petitioner relayed information about his personal history, his legal history, information about sports/teams, and he could explain to Dr. Macvaugh the functions of courts and the various officers of the courts.  (*See*, *e.g.*, Macvaugh Rpt. at 16-17.)

Dr. O'Brien and Dr. Swanson disagree that the sick call forms indicate that Petitioner possesses adequate communication skills.  Dr. Swanson believes the record indicates that Petitioner is learning to adjust to the system, but that he still does not understand when he needs to request services.  (Hr'g Tr. at 146).  For example, Dr. Swanson notes that Petitioner has been hospitalized during his incarceration, and that no requests for medical services were made prior to the hospitalizations.  (Hr'g Tr. at 147).  Dr. Swanson noted in her testimony at the evidentiary hearing that Petitioner's had only submitted 39 sick call forms out of 25 years of incarceration, and that each of the submitted forms contain only a small amount of his own handwriting.  (Hr'g Tr. at 146).  Similarly, Dr. O'Brien stated at the hearing that Petitioner's use of the forms only show that Petitioner had learned to successfully use the system.  (Hr'g Tr. at 54).

Interviews with Petitioner's family and friends provide more remote information about Petitioner's communication skills.  Mrs. Butler reported that Petitioner was "late to talk" as a child, and Mrs. Wiley reported Petitioner was quiet and rarely initiated a conversational topic.  (Swanson Rpt. at 30, 33).  Both his grandmother and wife noted that Petitioner did not express his

feelings, and Mrs. Butler reported that she would watch for changes in his behavior to determine whether Petitioner was upset.  (Swanson Rpt. at 32, 33).  Additionally, Petitioner's wife and one of his former employers noted that Petitioner did not perform well with verbal instructions, but that he could follow directions if a task was physically demonstrated for him. (Swanson Rpt. at 30, Hr'g Tr. at 126-27).

Self-Direction

The adaptive skill of self-direction involves an individual's ability to make independent decisions and carry out activities without direction.  (*See*, *e.g.*, Hr'g Tr. at 77-78).  During an interview with Dr. Swanson, Mrs. Wiley reported that Petitioner had adequate community skills when they lived in Mississippi, but that he needed more assistance when they moved to the Memphis area.  (Swanson Rpt. at 31).  Mrs. Wiley also stated that Petitioner relied upon others to plan things, like birthday parties, and that he normally held multiple part-time jobs that her father helped him find.  (Swanson Rpt. at 32).  Mrs. Wiley reported that Petitioner sometimes quit jobs because his boss was too "hard" on him, and that he had difficulty with verbal criticism.  (Swanson Rpt. at 31).  Rather, Mrs. Wiley reported that she thought Petitioner needed someone to demonstrate what he was doing wrong in order to benefit from critique.  (Swanson Rpt. at 31).  Mrs. Wiley also stated that Petitioner did not see the consequences of his actions and was not able to think ahead as to how his actions might impact future events.  (Swanson Rpt. at 32).  The Court notes that Petitioner's standard score on "Coping Skills," the adaptive skill area Dr. Swanson identified as associated with self-direction, was 1.67 standard deviations below the mean.  (*See* Swanson Rpt. at 29-30).

Mrs. Butler noted that she began to realize Petitioner could not make basic decisions when

his grandfather died, as that was the point in time in which Petitioner became responsible for helping her work the farm. (Swanson Rpt. at 11). Mrs. Butler found Petitioner odd jobs and managed his money when she lived with him, and after he moved to Memphis, his wife and father-in-law took over these roles. (Swanson Rpt. at 11). Once they were married, Mrs. Wiley was responsible for paying the bills, and her parents helped them make decisions. (Swanson Rpt. at 37). Mrs. Butler reported that Petitioner often went to his grandfather's friends if he needed advice, and that he went to his in-laws for advice even after he and Mrs. Wiley separated. (Swanson Rpt. at 33-34). Mrs. Wiley stated that Petitioner was reliable in getting the money to pay the household bills, but that he relied upon others to obtain utility and telephone services. (Swanson Rpt. at 32). She reported that Petitioner did not seem to have any idea of the cost for various services and would give her the amount of money she requested without question. (Swanson Rpt. at 32). Additionally, Petitioner never held a checking or savings account, and he cashed his paychecks at a liquor store. (Swanson Rpt. at 37; Macvaugh Rpt. at 9). Petitioner reported that after he paid his bills, he would drink or gamble away the remainder of his earnings. (Swanson Rpt. at 37; Macvaugh Rpt. at 9).

Social/Interpersonal

Although numerous documents and portions of testimony speak to Petitioner's adaptive functioning in the area of social or interpersonal skills, Dr. O'Brien testified that Petitioner's familial history indicates that he has significant deficits in this area. (Hr'g Tr. at 74). Dr. O'Brien noted that the available information repeatedly referenced the facts that Petitioner was very shy as a child and did not interact much with his peers, and that later in life he was so nice to others that he was frequently taken advantage of by them. (Hr'g Tr. at 74). Similarly, Diane Wiley reported

in her interview with Dr. Swanson that people frequently took advantage of Petitioner. (Hr'g Tr. at 218-19). Mrs. Wiley reported that when Petitioner was 15 and 16, he was not always paid for the work he did as a farm hand on the landowner's property. (Swanson Rpt. at 31). Dr. Macvaugh noted in his report that Petitioner's uncle by marriage, John Thacker, stated in his affidavit that Petitioner is good-natured and was taken advantage of by people who never paid Petitioner for work he performed for them. (Macvaugh Rpt. at 17-18). Dr. Ritter, in his report of his 1994 evaluation of Petitioner, noted that he believed Petitioner would be easily influenced by others were he released from prison. (Ritter Rpt. at 13). Dr. Swanson testified at the evidentiary hearing that being taken advantage of by others is a characteristic consistent with a diagnosis of mental retardation. (Hr'g Tr. 219). The *DSM-IV-TR* also notes that "[i]ndividuals with Mental Retardation may be vulnerable to exploitation by others. . .". *DSM-IV-TR* at 44-45.

Petitioner's grandmother, Mrs. Butler, later informed Dr. Swanson that Petitioner was so shy as a child that he would often hide when visitors came to the farm. (Swanson Rpt. at 33). Mrs. Butler stated that she felt as though Petitioner's social skills improved when he moved to Memphis, as his wife and her family got him involved in more activities. (Swanson Rpt. at 33). Mrs. Wiley indicated, however, that Petitioner never really expressed his feelings or asked about the feelings of others, and she noted that Petitioner preferred to spend his time with people much older or much younger than himself. (Swanson Rpt. at 32). In addition to her report that Petitioner was poor at conversation, Mrs. Wiley stated that while Petitioner always apologized if he recognized the need, he often did not pick up on social cues or recognize social errors. (Swanson Rpt. at 32).

Work

By all accounts, Petitioner was a reliable, hard worker who provided for his family. The affidavits filed during the course of Petitioner's post-conviction proceedings by his grandmother, his former employer, his friends, and his siblings all reference his strong work ethic and willingness to help others. Mrs. Butler noted that Petitioner always helped her with bills and was a steady worker. (Macvaugh Rpt. at 18). Perry Cole, one of Petitioner's former employers, noted that Petitioner used to work for him part-time driving a truck to pick up and deliver parts, and that he always performed the job well. (Macvaugh Rpt. at 19). Petitioner's older sister reported that Petitioner always helped her pay bills, took care of the cars, and babysat when needed. (Macvaugh Rpt. at 17). Petitioner's friend, Earl Isom, Jr., also reported that Petitioner frequently helped people by working on cars, and that he was a steady worker. (Macvaugh Rpt. at 19). Shirley Lewis, whose husband worked with Petitioner at Royal Crown Bottling Company before his death, noted that Petitioner would come visit and help her sons work on their cars after their father's death. (Macvaugh Rpt. at 20). Diane Wiley stated in her affidavit that Petitioner was always a good provider and steady worker. (Macvaugh Rpt. at 20).

Dr. Macvaugh notes that the affidavits cited in his report suggest that Petitioner was able to function without assistance when living in the community. (Macvaugh Rpt. at 34). He notes that the affidavits, taken as a whole, describe Petitioner "as being skilled in repairing automobiles, operating heavy equipment, and assisting in caring for the needs of his two young children," in addition to being a reliable employee who often worked more than one job at a time. (Macvaugh Rpt. at 34). However, Dr. Swanson notes in her report that experts recommend that examiners consider several factors when considering adaptive functioning in the area of work, including (a) how the person obtained employment; (b) how the employment ended; (c) whether the

employment was full-time or part-time; (d) the length of the employment; (e) the frequency with which the examinee changed jobs; (f) whether the tasks were repetitive manual labor or required decision making responsibilities; (g) whether promotion was ever given; (h) the type of supervision that was required; and (i) how the individual got to work. (Swanson Rpt. at 14-15). Petitioner reported to Dr. Swanson that he liked to work, and that he worked several part-time jobs when he could not obtain full-time employment. (Swanson Rpt. at 15). Usually, Petitioner's father-in-law would help him find employment, such as driving dump trucks or working at local junkyards. (Swanson Rpt. at 15). Prior to his incarceration, Petitioner also worked transporting workers and running the dish sterilizer for a railroad company. (Swanson Rpt. at 15).

Mrs. Butler reported to Dr. Swanson that, in his youth, Petitioner learned how to perform farm tasks fairly easily once they were demonstrated by his grandfather, and he helped feed livestock, gather eggs, and help his grandfather with plowing and planting. (Swanson Rpt. at 33). Petitioner reported to Dr. Swanson that he learned to do basic tractor and truck maintenance from the farmer who owned the land his grandfather sharecropped, and that he began assisting him at an early age. (Swanson Rpt. at 33). Petitioner reported to Dr. Macvaugh that he held a driver's license and worked for Royal Crown Bottling Company and Coca-Cola as a truck driver at one time, though he twice failed the test for a commercial license. (Macvaugh Rpt. at 8). Petitioner's supervisor at the Royal Crown plant stated that Petitioner could not perform tasks well with verbal instructions, though he could perform tasks that were adequately modeled. (Hr'g Tr. at 126-27).

Home Living & Self-Care

Dr. Swanson opines that Petitioner's significant limitations in the *DSM-IV-TR* adaptive

skill areas of home living and self-care are indicated by his scores on the VABS-II.[38]  In addition to the standard scores, however, Dr. Swanson conducted adaptive probes with Petitioner and interviews with family members to corroborate the results.  In adaptive probes conducted by Dr. Swanson, Petitioner reportedly demonstrated some sufficiency in basic skills, such as time-telling and calendaring skills, but he experienced significant limitations in time and money management. (Swanson Rpt. at 36-37).  For example, he was unable to identify the correct time when asked what time a roast that needs to cook for 1 ½ hours needs to be removed, but he performed better when shown pictures identifying different times.  (Swanson Rpt. at 36).  Petitioner could identify the months of the year in correct order, but he had difficulty when asked to identify the date of a return appointment if a doctor instructed him to return in two weeks from a given date.  (Swanson Rpt. at 36).  Petitioner could not read product labels and prices to determine which item cost the least or most.  (Swanson Rpt. at 37).  Petitioner could identify basic coins, but he could not give correct change for various purchases and experienced difficulty counting change in odd amounts. (Swanson Rpt. at 37).  Petitioner's self-report corroborates this information, as he reported to Dr. Swanson that he could count currency, but that he had difficulty with change.  (Swanson Rpt. at 37).

　　　Mrs. Butler indicated that Petitioner was slow to master basic hygiene, dressing, and toileting skills, and that she was still giving him prompts when he was 15 years old to get him to dress appropriately.  (Swanson Rpt. at 33).  When Petitioner was 15, Mrs. Butler was still choosing

---

[38] The subdomain score in "Domestic" on the VABS-II was 2.00 standard deviations below the mean.  Petitioner's subdomain score in "Personal" was 1.67 standard deviations below the mean.  Dr. Swanson opines that both of these scores indicate substantial limitations in the adaptive behavior skill areas of "home living" and "self-care."  (*See* Swanson Rpt. at 29-30).

and buying his clothes, and she stated that Petitioner's wife took over some of those tasks when he moved in with her family. (Swanson Rpt. at 33). Mrs. Wiley indicated to Dr. Swanson that Petitioner had adequate hygiene and dressing skills, though she stated she bought his clothes when he was 18 years of age. (Swanson Rpt. at 31).

Mrs. Butler reported that the only domestic tasks she was ever able to teach Petitioner when he was living with her were making his bed and putting up his possessions. (Swanson Rpt. at 34). Mrs. Butler submitted an affidavit in 1987 which stated that after his grandfather died, Petitioner fixed his own breakfast and cleaned up before work. When probed about the affidavit by Dr. Swanson, Mrs. Butler indicated that Petitioner would independently assemble the food she had prepared the night before, though he did not actually cook the meal. (Swanson Rpt. at 34). Petitioner reported to Dr. Swanson that he can brown meat, scramble eggs, make a sandwich or cereal, and toast bread. (Swanson Rpt. at 35).

Money concepts

Money concepts is an area recognized by the 2002 *AAMR* definition, but it is not a specific category listed in either the *DSM-IV-TR* or the 1992 *AAMR* definitions. However, two examiners have specifically reported on Petitioner's money and purchasing skills. First, Dr. Grant found that Petitioner's performance on the Managing Money Scale of the Independent Living Scale yielded a score of 67, which is in the 1st percentile. (Grant Aff. ¶ 22). Second, Dr. Swanson assessed Petitioner's adaptive behavior as it relates to money and purchasing. In interviews and reports, Dr. Swanson learned that Petitioner's wife or grandmother always paid the household bills, though sometimes Petitioner would stop by his grandmother's house to pick up the payment coupon and money and drop it off for her. (Swanson Rpt. at 37). In conducting adaptive probes designed to

assess Petitioner's money and purchasing skills, Dr. Swanson learned that Petitioner could identify a paycheck, but not the correct parts.  (Swanson Rpt. at 37).  She states that Petitioner "could not correctly identify the deposit amount on a sample deposit slip or discriminate between correctly and incorrectly completed checks.  He could not identify subtotal, tax, and total amounts on a receipt."  (Swanson Rpt. at 37).  These adaptive probes are consistent with Mrs. Butler's report that Petitioner had a hard time making quality purchases, and that she often had to assist him in purchases.  (*See* Swanson Rpt. at 33).  It is also consistent with Mrs. Butler's statement that when she sent Petitioner to pay a bill, she had to send exact change and a note.  (*See* Swanson Rpt. at 33).

Community Use

In addition to Petitioner's subdomain score of 1.67 standard deviations below the mean on the VABS-II in "Community," Dr. Swanson reports that her findings of limitations in the area of community use are supported through adaptive probes and interviews.  In direct academic probes, Petitioner was able to identify basic means of transportation, but that he could not read a bus or plane table.  (Swanson Rpt. at 37).  Petitioner informed Dr. Swanson that the military arranged his travel when he was in the Army, and that there was always someone to tell him where to go.  (Swanson Rpt. at 37).  Dr. Swanson reported that Petitioner exhibits some community awareness and public safety skills.  For instance, he correctly identified where one would go to purchase medicine or mail a letter, and the items found in a library.  (Swanson Rpt. at 37).  Petitioner reported, however, that others frequently took care of these types of tasks for him, and that even when he assisted his grandmother as an adult, she would have to give him detailed instructions.  (Swanson Rpt. at 37).

<u>Leisure</u>

Dr. Swanson opines that Petitioner's subdomain score of 2.00 standard deviations below the mean in "Play and Leisure Time" on the VABS-II indicate Petitioner's significantly limited adaptive skills in the area of leisure. Dr. Swanson conducted adaptive probes and interviews to attempt to corroborate this finding. Mrs. Wiley reported to Dr. Swanson that she taught him to play cards after she and Petitioner had their own house, though he did not know how to play card or board games when they first met. (Swanson Rpt. at 32). Petitioner reported that he sometimes played basketball on the Darling property and at school, but that he did not really understand the game until he was in prison. (Swanson Rpt. at 38). Mrs. Butler also stated that Petitioner did not play many games or sports as a young person, but she reported it was primarily because he was needed for chores. (Swanson Rpt. at 38). Petitioner reported that he began drinking alcohol around age 10 by sneaking sips from his grandfather's "white lightning" bottle, and that he was dependant upon alcohol by age 20. (*See* Swanson Rpt. at 26; Macvaugh Rpt. at 12). Petitioner admitted to some drug experimentation prior to his incarceration, as well. (Swanson Rpt. at 26; Macvaugh Rpt. at 12).

Dr. Macvaugh noted in his report that Petitioner knows how to play poker and knows how many cards there are in a deck. (Macvaugh Rpt. at 9). Dr. Macvaugh noted that Petitioner could identify the names of various sports team and conferences, and that Petitioner knew facts about both college and professional teams. (Macvaugh Rpt. at 29). Petitioner informed Dr. Swanson, however, that he never watched much television before he became incarcerated., but that he has a television in his prison cell and has learned about various sports since his incarceration. (Swanson Rpt. at 38).

Military Records

Petitioner's military records offer a wealth of information about his adaptive functioning from a non-biased source at a time when Petitioner was 19 years of age. Petitioner enlisted in the Army in December 1973 and was assigned to Radio Relay and Carrier Attendant training following boot camp. (Macvaugh Rpt. at 11). Petitioner reported to Dr. Macvaugh that he was removed from the training because he could not understand how to put the radio together. (Macvaugh Rpt. at 11). Military documents indicate that in February of 1974, Petitioner failed one test in radio training with a test of zero. (Macvaugh Rpt. at 10). As reported by Dr. Macvaugh, an Army document noted Petitioner's "difficulty relating the information contained in the technical manuals to the appropriate equipment. After counseling, both counselors and the individual concur that this course of training is too difficult for him to complete in a reasonable degree of time." (Macvaugh Rpt. at 10). Petitioner was returned to boot camp for another job classification, and he was reassigned as a wire man, which is a soldier who climbs up poles and runs telephone and electrical lines. (Swanson Rpt at 14). Because he was scared of heights, Petitioner reported, he would frequently jump off of the poles because he thought he was going to fall. (Swanson Rpt. at 14). During one jump, he fractured his leg. (Swanson Rpt. at 14). Petitioner was described in the military records as having "poor academic progress" and his "negative and resentful attitude toward his instructors" was noted as a problem. (Macvaugh Rpt. at 10). Two other counseling notes indicate that Petitioner's training in the reassigned course was prevented by his report of family problems, as well as the profile of his feet. (Macvaugh Rpt. at 10). One counseling note dated April 5, 1974, recommended that Petitioner not be further reassigned "because of his extremely negative attitude towards the military and his physical and mental limitations."

(Macvaugh Rpt. at 10).  In a discharge evaluation, it was noted that Petitioner lacked a high school diploma or GED, that he had low training scores, and that he had a "negative attitude and no desire to be in the Army." (Macvaugh Rpt. at 10).  Petitioner was ultimately discharged from the Army after serving approximately four months.  (Macvaugh Rpt. at 9).

Dr. Macvaugh opines that Petitioner's negative attitude is essential to evaluating his performance in the Army, while Dr. O'Brien and Swanson each testified that the military records are consistent with someone who has mild mental retardation.  Dr. Swanson testified that these records demonstrate that Petitioner failed when his support system was suddenly removed in the Army, as he could not learn quickly enough to stay in the system.  (Hr'g Tr. at 121-22).  Dr. Swanson testified that  people with mental retardation generally hit a "plateau" where one begins to see resistance, change in attitude, or lack of interest.  (Hr'g Tr. at 143).  Dr. Swanson stated that this plateau is in the area between what the individual can do well and what they cannot do unless the activity is modified for them.  (Hr'g Tr. at 143).  Dr. Swanson stated that she believes that Petitioner became frustrated when he hit the plateau in the military, and that it was interpreted as a poor attitude.  (Hr'g Tr. at 143).  Dr. O'Brien echoed this sentiment in his testimony, and he noted that many people with mental retardation develop a poor attitude toward learning because it is difficult and frustrating for them.  (Hr'g Tr. at 44).

Health & Safety

Though Dr. Swanson did not obtain standard scores in the areas of health and safety, she opines that Petitioner's prison, medical, military, and psychiatric records support that he has substantial limitations in these areas, as do the interviews and adaptive probes she conducted.  (Swanson Rpt. at 30).  Dr. Swanson notes that Petitioner's obtained scores on the Independent

105

Living Scales administered by Dr. Grant in 2003 would support a finding of significantly low functioning in health and safety, as well. (Swanson Rpt. at 30). In 2003, Dr. Grant reported that Petitioner's performance on the Health and Safety subtest of the Independent Living Scale yielded a score of 64, and he opined that Petitioner suffers from significant limitations in the areas of health and safety. (Grant Aff. ¶21).

The Court has already referenced the relevant information contained in some of these records, and it here notes specific information obtained from adaptive probes conducted by Dr. Swanson. As a result of her direct probes with Petitioner, Dr. Swanson notes that Petitioner had difficulty identifying products used to keep oneself clean and the proper medications or treatments for minor physical ailments. (Swanson Rpt. at 37). Petitioner experienced difficulty identifying foods that made up a balanced diet, as well as items used to clean dishes, shampoo hair, keep nails neat, and prevent tooth decay. (Swanson Rpt. at 37). Petitioner could read a room thermometer, but he could not read an oral thermometer and experienced difficulty knowing when a particular temperature warranted medical treatment. (Swanson Rpt. at 37). Dr. Swanson also reports that Petitioner experienced difficulty knowing what medications would lower a fever or prevent a sunburn. (Swanson Rpt. at 37).

Mrs. Wiley reported that Petitioner often needed medication labels explained to him and reminders about how the medication was to be taken. (Swanson Rpt. at 31). Dr. Swanson noted this fact during her adaptive probes with Petitioner, as he needed assistance reading sample medical labels and answering questions about medication administration. (Swanson Rpt. at 37). Mrs. Wiley reported that she never knew Petitioner to go to the doctor. (Swanson Rpt. at 31). Mrs. Wiley reported that when Petitioner was home on military leave, his injured leg became

infected because he did not follow the recommended treatment. (Swanson Rpt. at 31). Petitioner

denies that his leg became infected by his failure to properly care for it, however. (Swanson Rpt.

at 14). Mrs. Wiley reported that she never knew him to take his own temperature or that of the

children, and he refused to make a doctor's appointment even when he fell off of a road scraper

and was knocked unconscious. (Swanson Rpt. at 31).

Petitioner informed Dr. Macvaugh that either he or his wife would generally take their

children to the doctor if they became ill. (Macvaugh Rpt. at 21). Petitioner reported to Dr.

Macvaugh that on one particular occasion, he took a prescription from the doctor across the street

to a drug store to get ear drops for his son after learning his son had an ear infection. (Macvaugh

Rpt. at 21). Petitioner also reported to Dr. Swanson that he used to ask others about what to do

when he became ill, and that he now relies upon prison medical staff to meet his needs. (Swanson

Rpt. at 37).

Dr. O'Brien stated at the evidentiary hearing that he did not have sufficient evidence to

form an opinion as to whether Petitioner manifested significant limitations in the adaptive areas of

health and safety prior to age 18. (Hr'g Tr. at 86-87).

Conclusions about Adaptive Functioning

The Court finds Petitioner has met his burden of demonstrating by a preponderance of the

evidence that he suffers from significant limitations in at least two adaptive skill areas identified

by the *DSM-IV-TR* and the 1992 *AAMR* prior to the age of 18. For the reasons stated in its

discussion of the evidence relevant to specific adaptive skill areas, the Court finds that Petitioner

has met his burden, at the very least, in the areas of communication, self-direction, and functional

academics. The Court also notes that Petitioner's standardized testing scores in the subdomain

areas of communication, functional academics, and self-direction, are two standard deviations below the mean and are supported with collateral evidence. These subdomains make up the "conceptual" composite of the 2002 *AAMR* criteria. 2002 *AAMR* at 42, 82.

The Court specifically notes that the affidavits in this case, submitted for the purpose of Petitioner's case in mitigation during his State court proceedings, do not provide the searching inquiry necessary to assess adaptive functioning in a mental retardation inquiry. Both Dr. O'Brien and Dr. Macvaugh noted that the validity of the affidavits is a concern, as they were prepared for the purpose of providing mitigating evidence at a time when identifying Petitioner's adaptive deficits was not particularly relevant. (Hr'g Tr. at 48-50, 247; Macvaugh Rpt. at 34). As Dr. O'Brien explained in his testimony at the evidentiary hearing, an *Atkins* case requires the examiner to look very specifically at evidence of deficits, both intellectual and adaptive, prior to the age of 18. (Hr'g Tr. at 49-50). The affidavits filed in this case do speak to certain abilities possessed by Petitioner, but they do not address the adaptive skill inquiry relevant to the Court's consideration. The affidavits do not inform the Court of what Petitioner can not do. Additionally, with regard to Petitioner's strengths, these affidavits do not probe into how long it took Petitioner to acquire a skill, how much support he needed to perform the skill, and whether he could perform the learned skill in a new environment.

Dr. Swanson is the only professional who administered standardized adaptive functioning assessments and interviewed collateral informants to corroborate her findings with regard to this issue.[39] As an assessment into an individual's adaptive behavior requires consideration of what the

---

[39] The Court notes that neither Dr. O'Brien nor Dr. Macvaugh interviewed collateral informants, and Dr. Macvaugh testified at the evidentiary hearing that he should have requested the Attorney General's Office to provide him with contact information for Petitioner's family

108

individual can do without assistance in the open community, the Court finds it important that it be provided with evidence that vague or ambivalent responses by interviewees were probed to substantiate or discount reports of Petitioner's ability to perform a given skill totally independent of support. (*See*, *e.g.*, Hr'g Tr. at 130-31). Dr. Swanson's report and testimony assure the Court that such probes were conducted during the course of her evaluation.

Petitioner's limitations in functional academics are supported by academic testing, adaptive assessments, school records, interview, reports, and military records. In addition, all three testifying experts and Dr. Grant agree that Petitioner's functioning in this adaptive area is significantly limited. Family reports, interviews, academic tests, prison records, and school records support a finding that Petitioner's communication skills are significantly limited. Finally, Petitioner's significant limitations in the skill of self-direction is evidenced by the adaptive assessment, his work history, his gambling and drinking addictions, as well as the reports from his family and friends.

An assessment of a person's ability to perform a task well, and the consideration of what supports a person of a given age should need to perform the task is largely a subjective inquiry. The weight of the evidence in the record indicates that Petitioner can perform many tasks well, but that his ability to learn and perform tasks without support is significantly limited. For instance, the record is replete with evidence that Petitioner was a very reliable, steady worker, but it also notes that Petitioner worked part-time, manual labor jobs that were obtained for him. Petitioner is able to learn skills, but he can not take verbal instruction and requires that tasks be modeled for him. The evidence suggests that Petitioner always provided money to pay bills, but that he did not know

and friends. (Hr'g Tr. at 269).

how to obtain services or how much they should cost.  Petitioner communicates by letter and by telephone, but he does so with the assistance of bound notepads of information and reference aids. Dr. O'Brien stated at the hearing that Petitioner "had no difficulty talking to me and answering questions.  But when you test him and you look at other information available, you are able to judge the level at which he actually functions."  (Hr'g Tr. at Tr. 48).  That is a sentiment also expressed by Dr. Swanson who noted in her testimony that an evaluation must look beyond what a person does and determine what supports he or she needs to learn the skill and demonstrate it. (*See*, *e.g.*, Hr'g Tr. at 130-31).  This Court cannot discount the limitations in adaptive functioning evidenced in the record simply because some of Petitioner's strengths are not congruent with stereotypical notions about what activities an individual with mental retardation can perform. (*See*, *e.g.*, Hr'g Tr. at 115-117).

Finally, the Court does not discount the possibility that Petitioner's adaptive skills were or are limited in other areas.  As the Court is satisfied that Petitioner's adaptive skills are sufficiently limited so as to meet the relevant diagnostic criteria, it is unnecessary for the Court to attempt a specific finding as to each of the categories of adaptive skill areas.  The Court's conclusion of significant limitation is supported by information from multiple sources, and the Court finds that Petitioner has demonstrated by a preponderance of the evidence that he had significant deficits in adaptive behavior in at least two adaptive skill areas as identified by the 1992 *AAMR* and *DSM-IV-TR* prior to the age of 18.

### Onset Before 18

Dr. Swanson and Dr. O'Brien concluded that in Petitioner's case, all of the available evidence demonstrates the onset of mental retardation prior to the age of 18.  (O' Brien Rpt. at 6;

Swanson Rpt. at 39; Hr'g Tr. at 54-55; 80). Dr. Macvaugh opines that Petitioner suffers from borderline intellectual functioning, and he notes that Petitioner's history involves no indication of mental retardation testing or diagnosis, special education classes, or that he received disability for an intellectual impairment before the age of 18. (Macvaugh Rpt. at 32). However, Petitioner attended a segregated school where special education classes were not offered. (*See* Swanson Rpt. at 13; Hr'g Tr. at 54-56).

In State court and at the evidentiary hearing in this case, Petitioner's numerous absences from school were debated as a cause for Petitioner's poor academic performance. Dr. Macvaugh opines that Petitioner's low academic scores are expected, in part, because of his limited education, his frequent absences from school, and his use of alcohol during that time. (Macvaugh Rpt. at 17). Dr. O'Brien testified at the evidentiary hearing that an examiner must be careful not to draw a direct cause and effect between numerous absences and failing grades, as an individual's difficulty with schoolwork can affect how regularly one attends school. (Hr'g Tr. at 72-73). Petitioner performed at his best academically in the 6th grade when he also had the fewest number of absences of his school career. However, any correlation between Petitioner's improved academic performance and his relatively low absences that year must be considered in light of the fact that Petitioner was repeating the 6th grade when he obtained the improved scores. Petitioner was retained in both the 5th and 6th grades, socially promoted in the 7th, and dropped out in the 8th. (Swanson Rpt. at 13; Macvaugh Rpt. at 5-6). From the beginning of his formal education, Petitioner struggled academically. As noted in the discussion of Petitioner's functional academic skills, Petitioner received all D's with the exception of one C- in the first grade.

In reviewing all of the information in the record, the Court finds that collateral information

supports a determination that Petitioner's limited formal education and school absences alone cannot account for the limitations in his intellectual functioning and adaptive behavior skills. Mrs. Butler reported that Petitioner was late to talk as a child, and he had trouble expressing his feelings from early childhood through adulthood. (Swanson Rpt. at 33). Mrs. Butler reported that Petitioner needed to be assisted when making purchases, and that he needed to be provided with exact change and a note if he was sent to pay a bill for her. (Swanson Rpt. at 33). She also stated that Petitioner was much older than his nieces and nephews were in learning to make his bed and put away his possessions. (Swanson Rpt. at 33). Mrs. Butler reported to Dr. Swanson that Petitioner was very slow to develop basic hygiene, dressing, and toileting skills, and that even when Petitioner was age 15 she would have to provide Petitioner with prompts so that he could adequately perform the dressing skills. (Swanson Rpt. at 33). Mrs. Wiley helped Petitioner with these skills after he moved in with her and her family. (Swanson Rpt. at 33).

Although he was 19 when he entered the military, Petitioner's military records provide a snapshot into Petitioner's intellectual functioning and adaptive behavior skills close to the age of 18. These reports indicate that Petitioner had a negative attitude toward the Army, but they also reinforce the opinion that the training was too difficult for Petitioner to master. Petitioner's school records, the reports of his family members, and the adaptive assessment measures given in this case support a determination that Petitioner's significantly subaverage general intellectual functioning and significant deficits in adaptive skills were present prior to age 18.

### *Malingering*

Each of the experts who testified at Petitioner's evidentiary hearing in federal court administered to Petitioner a test designed to detect malingering. Dr. Swanson administered the

112

Rey 15 Word List, Dr. O'Brien administered the 21 Word Test, and Dr. Macvaugh administered the Test of Memory Malingering. Each expert found no evidence that Petitioner was malingering his testing results. (*See* Swanson Rpt. at 35; O'Brien Rpt. at 3; Macvaugh Rpt. at 30).

### Conclusion as to Claim of Mental Retardation

The Court notes that outside of an *Atkins*' context, clinicians do not perform a specific evaluation to determine the presence or absence of mental retardation. (*See, e.g.*, Hr'g Tr. at 259-60). In this case, the examining experts were asked to look at a particular diagnosis and determine whether Petitioner meets the criteria. The experts' use of that clinical criteria guides this Court's legal conclusion, and the Court has found each definitional prong to be met. The Court notes that it has no authority to conclude that Petitioner, while properly diagnosed with mental retardation as a clinical matter, is not the offender intended to be exempt from execution under the holdings in *Atkins* and *Chase*. There is no "degree" of mental retardation for this Court to consider in determining whether Petitioner is entitled to relief on his claim. In *Chase v. State*, the Mississippi Supreme Court recognized that the *Atkins* majority intended that "even the most marginally mentally retarded persons, regardless of degree" be exempt from the death penalty. *See Chase v. State*, 873 So.2d 1013, 1027 (Miss. 2004).

Petitioner has undergone four separate *Atkins*-related evaluations, and three experts conclude that Petitioner meets the definition for mental retardation under the criteria of the *DSM-IV-TR* and *AAMR*. The Court has considered academic testing results, general intellectual functioning testing results, standardized adaptive assessment results, reports, interview results, affidavits, direct probe responses, expert opinions, and school, medical, and military records. Based upon all available evidence, the Court finds that Petitioner has met his burden of proving by

a preponderance of the evidence that he meets the standard for mental retardation under Mississippi law, and that he meets the diagnostic criteria for a diagnosis of mental retardation in the *DSM-IV-TR*, the 1992 *AAMR*, and the 2002 *AAMR*.[40]  *See, e.g.*, *Chase v. State*, 873 So.2d at 1029 ("The factors to be considered by the trial court [at the conclusion of the hearing to determine whether the defendant has established mental retardation] are the expert opinions offered by the parties, and other evidence [o]f limitations, or lack thereof, in the adaptive skills areas listed in the definitions of mental retardation approved in *Atkins*, and discussed above.").  Relief on this claim shall be granted.

## XI.    Cumulative Error

Petitioner asserts that the aggregate impact of errors in this case warrant this Court vacating his death sentence.  (Pet. Memo 64).  As the Court has determined Petitioner's execution is barred under federal constitutional law, the Court finds this claim moot.

### Conclusion

For the reasons stated herein, Petitioner is entitled to have his sentence of death vacated pursuant to *Atkins v. Virginia*, 536 U.S. 304 (2002) and *Chase v. State*, 873 So.2d 1013 (Miss. 2004).  The Court will issue the writ unless the appropriate officials vacate Petitioner's sentence of death and impose a lesser sentence within sixty days of entry of this Court's opinion.  The remainder of Petitioner's claims do not warrant federal habeas corpus relief and shall be dismissed.

---

[40] The Court notes Petitioner would also qualify for a diagnosis of mental retardation under the 2002 *AAMR* definition, as he has significant limitations as demonstrated by two standard deviations below the mean in the conceptual composite of adaptive behavior, which is one of the three categories of adaptive skill behaviors in the 2002 definition.

A separate order in accordance with this opinion shall issue today.

**THIS** the 5th day of November, 2009.

/s/ W. Allen Pepper, Jr.

W. ALLEN PEPPER, JR.

UNITED STATES DISTRICT JUDGE